STATE, EX REL. WILLIS D. OLDHAM, RELATOR, V. JAMES R. DEAN, RESPONDENT.

FILED MAY 7, 1909.  No. 16,073.

1. **Constitutional Law**: AMENDMENTS TO CONSTITUTION: CANVASS OF RETURNS. Section 4 of the act of 1877 (laws 1877, p. 114), while in force, considered in connection with section 4, art. V of the constitution, required the canvass of the vote of the people upon the question of the adoption of proposed amendments of the constitution to be made by the speaker of the house of representatives in the presence of a majority of each house of the legislature, who were required to assemble in the hall of the house of representatives for that purpose.

2. ———: ———: RETURNS. Section 4, art. V of the constitution, requires the returns of every election for officers of the executive department of the state to be sealed up and transmitted by the returning officers to the secretary of state, directed to the speaker of the house of representatives. Section 4, ch. 3, Comp. St. 1907, requires the returns of an election upon proposed constitutional amendments to be made to the board of state canvassers, directed to the secretary of state.

3. ———: ———: CANVASS OF RETURNS. There being no specific provision for the canvassing of the returns of election on constitutional amendments and no provision for such returns to be transmitted to or lodged elsewhere than with the board of state canvassers, *held* it was the duty of said board to canvass the returns.

4. **Statutes**: ENACTMENT: EVIDENCE. "The enrollment, authentication and approval of an act of the legislature are *prima facie* evidence of its due enactment." *State v. Frank*, 60 Neb. 327.

5. ———: ———: ———. "The silence of the legislative journals is not conclusive evidence of the non-existence of a fact, which ought to be recorded therein, regarding the enactment of a law." *State v. Frank*, 60 Neb. 327.

6. ———: ———: ———. Act of April 5, 1895 (laws 1895, ch. 4), *held* to have been legally enacted, and "not invalidated because of silence of senate journal as to concurrence in a formal amendment by the house." *State v. City of Wahoo*, 62 Neb. 40. Said act repealed section 4 of the act of 1877, *supra*, and placed the duty of canvassing the vote on constitutional amendments with the board of state canvassers, and which act was in turn amended and repealed by the act of 1897 (laws 1897, ch. 5).

7. **Elections: EXECUTIVE STATE OFFICERS: CANVASS OF RETURNS.** The canvassing of an election for executive state officers imposed upon the speaker of the house of representatives is a duty especially enjoined upon him resulting from his office as such speaker, and is a ministerial duty to be performed by him in the presence of a majority of the members of each house. When such votes are duly canvassed by him, his duties are at an end.

8. **Constitutional Law: AMENDMENTS TO CONSTITUTION: CANVASS OF RETURNS.** The law does not permit the returns of election on proposed constitutional amendments to be removed from the office of the secretary of state, and does not confer upon the speaker of the house any authority or power to canvass such returns.

9. ——: ——: ——. A joint meeting of a majority of the members of each house to witness the canvass of votes by the speaker of the house possesses no legislative authority, and cannot create or impose duties or obligations upon executive state officers where none existed before, nor can it canvass election returns or declare the result.

ORIGINAL application in the nature of *quo warranto* to determine the right of respondent to the office of judge of the supreme court. *Judgment for respondent.*

*T. J. Mahoney* and *Joel W. West,* for relator.

*Irving F. Baxter, James H. Van Dusen, C. C. Flansburg* and *W. W. Morsman, contra.*

REESE, C. J.

This is an action in the nature of a *quo warranto,* instituted by the relator, Willis D. Oldham, and against the respondent, James R. Dean, for the purpose of testing the right of said Dean to the office of judge of the supreme court. Sufficient facts are alleged in the information and answer to show the eligibility and competency on the part of both relator and respondent to hold said office if legally appointed thereto, and the only question is as to which of the parties received the legal appointment. So far as the facts involved in the case are concerned, there is practically no dispute. It is

shown by the pleadings and the agreements of counsel made on the argument of the case at the bar of the court, as well as by the public history of the state, that the legislature of 1907 duly submitted to the electors of the state a proposition to amend the state constitution so as to increase the number of judges of said court from three to seven members. At the general election of 1908, held November 3 of that year, the amendments submitted by the action of the legislature were duly adopted by the vote of the people, the returns duly certified to by the several county clerks and forwarded to the state board of canvassers, and the said board, of which the governor was a member, canvassed the vote, the result being announced by proclamation by the governor, who, soon thereafter, appointed four members of the court, all of whom accepted and duly qualified and entered upon the duties of the office. One of the appointees resigned the next day after his qualification, and the respondent was appointed to fill the vacancy.

The amendment made it the duty of the governor making the appointment to appoint two judges for one year and two for three years. Doubts having arisen as to the authority of the state canvassing board to canvass the votes upon the subject of the adoption of the amendments, the joint convention of the legislature of 1909 made a demand upon the secretary of state that the returns sent the state canvassing board be submitted to that body in order that the vote be there canvassed, but which the secretary refused to furnish, claiming that the returns were required to be kept in his office as a part of the records thereof. A copy of the tabulated returns, as issued by his office in printed form, was procured with his certificate attached showing that it was practically a correct copy of the result of the vote as canvassed by the state canvassing board. A canvass was made by the joint convention, the result declared, and the newly elected governor issued his proclamation declaring the amendments adopted. He then appointed four members

of the court, two of whom were of those appointed by the former governor. The relator was appointed for the term of one year, who took the required oath and demanded the office of respondent. It will be seen, therefore, that it is conceded that the constitutional amendments were duly and legally adopted by the necessary majority of the votes cast at the election in November, 1908, and that the amendments submitted are now, and have been since the casting of the votes on election day, a part of the constitution. It is also admitted that the judges holding under the first appointment are, and have been since their qualification, officers *de facto*, and that their acts are not void; but it is claimed that while the office existed they were irregularly and illegally appointed, and relator, having received his appointment after the canvass in the joint convention, is now entitled to the office. The whole case turns upon the question as to which was the legal canvass, proclamation and appointment. During the year 1908 Honorable George L. Sheldon was the duly elected and acting governor of the state. At the November election of that year Honorable Ashton C. Shallenberger was duly elected to said office and entered upon the discharge of the duties thereof on the 7th day of January, 1909.

Section 1, art. XV of the constitution, provides that either branch of the legislature may propose amendments to that instrument, and, after due publication of the required notice, the same shall be voted upon at the next election for members of the legislature, and, if a majority of the electors voting at said election adopt such amendments, they shall become a part of the constitution. In the year 1877 the first session of the legislature after the adoption of the constitution passed an act entitled "An act to provide the manner of proposing amendments to the constitution, and submitting the same to the electors of this state." Laws 1877, p. 114. The provisions of that act followed those of the constitution, except that it dealt more in detail with procedure, and we are not

interested in its provisions, except as to the fourth and fifth sections thereof, which are as follows:

"Section 4. Public notice that the proposed amendment or amendments is, or are to be voted upon, shall be given in each county in the same manner as is or may be required by law regulating general elections, and the returns shall be made and the votes canvassed in the same manner and by the same officers as is or may be required by the law in the case of electing the executive officers of the state.

"Section 5. If a majority of the votes cast at the election herein provided for, be for the proposed amendments, the governor, within ten days after the result is ascertained, shall make proclamation, declaring the amendments to be part of the constitution of the state."

It will be observed that by section 4 it was provided that the votes upon a proposed amendment should be "canvassed in the same manner and by the same officers as is or may be required by the law in the case of electing the executive officers of the state." As the votes cast for such officers are canvassed by the speaker of the house in the presence of a majority of the members of each house, it is clear that by that section the votes cast upon the proposed amendment should be canvassed in the same way. Section 4, art. V of the constitution, requires the returns of every election for the officers of the executive department to be "sealed up and transmitted by the returning officers to the secretary of state, directed to the speaker of the house of representatives, who shall, immediately after the organization of the house, and before proceeding to other business, open and publish the same in the presence of a majority of each house of the legislature, who shall, for that purpose, assemble in the hall of the house of representatives." This provision of the constitution was elaborated by the act of 1877 (laws 1877, p. 143), and, so far as returns for election of state executive officers are concerned, was practically a restatement of the provisions of the constitution above quoted.

Section 4 of this act created the state canvassing board, consisting of the governor, secretary of state, auditor of public accounts, treasurer and attorney general, and provided that they should within 20 days next succeeding an election "proceed to open and canvass all returns directed to the secretary of state." The governor was made *ex officio* president of that board, and it became his duty to "open and publish the returns made, and the person having the highest number of votes cast for either of the offices voted for, shall be declared duly elected, and the governor shall immediately issue certificates of election to the persons thus elected." (Sec. 5.) So far as we are able to ascertain, the law remained unchanged upon these subjects until the year 1895, when Senate File No. 287, being "An act to amend section four (4) of chapter three (3) of the Compiled Statutes of Nebraska," was passed and, as claimed by respondent, became a law. As this act was intended as an amendment of section 4 of the act of 1877, above herein copied, we give the amendatory section in full.

"Section 4. Public notice that the proposed amendment or amendments are to be voted upon shall be given as provided in section 1 of article 17 (15) of the constitution of this state and the returns shall be made and the votes canvassed in the same manner and by the same officers as now required by law in the case electing of presidential electors, judges of the supreme court and district courts and regents of the state university." Laws 1895, p. 69.

As by the act of 1879 (laws 1879, p. 240), and which is still the law, the canvass of votes cast for presidential electors, judges of the supreme and district courts and regents of the university is to be made by the board of state canvassers, the act of 1895, if valid, took away from the speaker of the house the duty of canvassing the vote on constitutional amendments and cast it upon the state canvassing board. The section (Comp. St. 1893, ch. 3, sec. 4) was the same section as section 4 of the act of 1877.

It is contended by relator that the act of 1895 was not constitutionally passed by the legislature, and that therefore it was void, and the law of 1877 requiring the vote on constitutional amendments to be canvassed by the speaker of the house is still in force. The record of the passage of the act of 1895 may be briefly stated as follows: The bill (Senate File No. 287), entitled "A bill for an act to amend section four (4) of chapter three (3) of the Compiled Statutes of Nebraska," was introduced in the senate and regularly passed, the record showing all necessary steps to have been taken. It is conceded that up to that time the record is complete and regular. It was then certified to the house, where the usual formalities were observed until it came to the vote on its passage. At that time a motion was made that it be "recommitted to the committee of the whole for the purpose of adding a repealing clause of the section amended." The motion prevailed, and the house resolved itself into a committee of the whole house. The committee arose and reported back the bill, with the same title as before, with the recommendation that "it pass as amended." The bill was then regularly passed and returned to the senate. The message from the chief clerk of the house was as follows: "I am directed by the house to inform your honorable body that they have passed the following bills: Senate File No. 287, a bill for an act to amend section four (4) of chapter three (3) of the Compiled Statutes of Nebraska." We find no further record made by the senate until the report of the committee on engrossed and enrolled bills, which was: "We have carefully examined and compared Senate File 287, a bill for an act to amend section four of chapter three of the Compiled Statutes of Nebraska, and find the same correctly enrolled." The act was regularly signed by the presiding officers of each house and reported to the governor who gave it his approval.

The question here is: Does the failure of the senate journal to show any action by that body upon the amend-

ment by the house, adding the repealing clause, render the act invalid? It is said by the relator that "the decisions of this court have put beyond debate the following propositions: (1) The enrolled bill signed by the governor, and filed in the office of the secretary of state, is *prima facie* evidence of the legislative enactment. (2) The enrolled bill may be impeached, and the *prima facie* evidence furnished by it entirely destroyed, by the journals showing that the bill was not constitutionally enacted. (3) Where the journal is mutilated, or partially destroyed, or pages missing at such parts as would probably disclose the action of the legislature, evidence *aliunde* may be received to support the *prima facie* case made by the enrolled bill, and in such case, or if there is evidence of negligence in the manner of keeping the journal, the silence of the journal will not be accepted as conclusive evidence of the want of action by the legislature." It is also said in his brief that he finds no mutilation of the journal of either house, no carelessness in the manner in which they were kept, every step reported in its logical and proper order, the title of the bill always set forth in the same identical words and figures, and that everything about the journal indicates that it is a perfect record and speaks the absolute truth as to the proceedings of each house. It is therefore argued that this condition clearly shows that the senate took no action upon the amendment added by the house and did not concur therein, and therefore the bill was not legally passed and is void.

It is contended by the respondent: (1) That the mere silence of the senate journal upon the matter referred to, when considered in connection with the report of the senate committee on engrossed and enrolled bills; the signing of the bill by the presiding officers of the two houses and the approval by the governor raises no presumption that the bill was not legally passed, nor that this amendment was not concurred in by the senate, but that the well-recognized presumption growing out of

these facts, that the act was legally passed, must prevail. (2) That there is no law, constitutional or otherwise, requiring that the specific fact of such concurrence be shown by the record.

A brief review of the cases decided by this court discloses the following: In *State v. McLelland,* 18 Neb. 236, it was held that, where an act was passed by both houses providing that in counties of 15,000 inhabitants the office of register of deeds should be created, and the bill as enrolled and signed by the governor caused the change to be made in counties containing 1,500 inhabitants, the act was invalid because the bill signed by the governor had never been passed by the legislature, and the one passed had not been signed by the governor. The opinion is of considerable length and shows that at common law the bill as signed furnishes conclusive evidence that it was regularly passed, but that the provisions of the state constitution permit an investigation of the journals for the purpose of ascertaining if the requirements of that instrument have been complied with.

In *State v. Moore,* 37 Neb. 13, where a bill appropriating $15,000 for a specified purpose passed both houses, but by a clerical error of an enrolling clerk the figures were changed to $25,000, for the purpose named, and in that condition signed by the presiding officers of both houses and approved by the governor, it was held that the bill appropriated $15,000, and that the journals might be consulted for the purpose of ascertaining the facts, and that the enrolled and engrossed bills as signed by the presiding officers and the governor constituted *prima facie* evidence that they were duly passed in the condition in which they appear. In the opinion, while discussing the question of the right of the house to amend a bill which it had passed and which had been sent to the senate where it was amended and returned for concurrence, it is said: "We do not understand, however, that, as to the mere routine of parliamentary business, courts are required to interfere with legislative proced-

ure, where no substantive requirement of the constitution has been violated. The signature of the officers of the respective branches of the legislature, attesting the due passage of the bill in question, precludes an inquiry in that direction."

In *In re Granger*, 56 Neb. 260, it was held that it was not competent to impeach the proceedings of the legislature by contradicting the journals of the house and senate and the facts proper to be inferred from the approval of the governor and the attestation of the bill by the officers of both branches of the legislature, and, in writing the opinion, Commissioner RYAN quotes with approval the following from *State v. Francis*, 26 Kan. 724: "In our opinion, the enrolled statute is very strong presumptive evidence of the regularity of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity, unless the journals of the legislature show clearly, conclusively, and beyond all doubt that the act was not passed regularly and legally. * * * If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid."

In *Webster v. City of Hastings*, 56 Neb. 669, Commissioner RYAN, in writing the opinion, reluctantly followed the rule theretofore adopted in this state that the certificate of the presiding officer of the house over which he presided is merely *prima facie* evidence of the fact, and that evidence may be received to ascertain whether or not the bill actually passed; but Commissioner IRVINE presented a strong dissenting opinion, concurred in by Judge SULLIVAN, holding that "the enrolled act deposited with the secretary of state and bearing the certificates of the presiding officers of the two houses and the approval of the governor is the final and unimpeachable evidence

26

not only of the terms of the act, but of the fact of its due enactment."

In *State v. Abbott,* 59 Neb. 106, it was held that the enrolled bill, authenticated by the proper officers of the house and approved by the governor, and the journals of the houses are the only competent evidence in a controversy in regard to the due passage of the bill. This precise question here does not appear to have arisen in that case.

In *Webster v. City of Hastings,* 59 Neb. 563, it was held that the due authentication and enrollment of a statute affords only *prima facie* evidence of its passage; that the legislative journals may be examined for the purpose of ascertaining. whether a measure was enacted in the mode prescribed by the constitution; that, if the entries found in such journals explicitly and unequivocally contradict the evidence furnished by the enrolled bill, the former will prevail; and that such journals kept in obedience to the command of the constitution are the best evidence of what affirmatively appears in them regarding the enactments of a law.

In *State v. Frank,* 60 Neb. 327, one of the questions presented was as to whether the silence of the journal was conclusive evidence of the non-existence of a fact which ought to be recorded therein regarding the enactment of the law, and Judge SULLIVAN, in writing the opinion, after citing the cases above referred to, says: "These cases hold that the records of the lawmaking body may be looked into for the purpose of ascertaining whether a statute has been constitutionally enacted; but they do not decide, or give countenance to the claim, that the silence of the journals, or either of them, is .conclusive evidence of the non-existence of any fact which ought to be recorded therein. What they decide is that the journals are unimpeachable evidence of what they contain; not that their silence convicts the legislature of having violated the constitution. Every presumption is in favor of the regularity of legislative proceedings, and it is rather

to be inferred that the journals are imperfect records of what was done, than that the legislature failed to perform the more solemn and important duties enjoined upon it by the constitution. In *Ex parte Howard-Harrison Iron Co.,* 119 Ala. 484, 24 So. 516, cited in *State v. Abbott,* 59 Neb. 106, it is said: 'Of course the presumption is that the bill signed by the presiding officers of the two houses and approved by the governor is the bill which the two houses concurred in passing, and the contrary must be made to affirmatively appear before a different conclusion can be justified or supported. So, here, it must be made to affirmatively appear that amendments of the house bill in question were adopted by the senate and were not concurred in by the house.' The enrolled bill has its own credentials; it bears about it legal evidence that it is a valid law; and this evidence is so cogent and convincing that it cannot be overthrown by the production of a legislative journal that does not speak, but is silent. Such seems to be the conclusion reached by a majority of the courts; and such, certainly, is the trend of modern authority. To hold otherwise would be to permit a mute witness to prevail over evidence which is not only positive, but of so satisfactory a character that all English and most American courts regard it as ultimate and indisputable. * * * Counsel for Frank insist that it is the duty of this court to take judicial notice of the legislative journals, and that a finding contrary to our judicial knowledge cannot stand. They also contend that, since the house journal does not show the yea and nay vote upon the final passage of the bill, we are bound to declare, without further inquiry, that the constitutional requirement was not observed, and that the law is, therefore, null. In other words, respondent's position is that we must look in the office of the secretary of state for a record of the vote, and, if we do not find it, must say that it does not exist now, and that it never did exist. We are not willing to go quite so far for the purpose of overthrowing a duly authenticated act of the

legislature." A rehearing was granted in that case, and the opinion thereon, by Judge NORVAL, is found in 61 Neb. 679, but no new light is thrown upon the question discussed in the first opinion, except a more complete demonstration, if possible, that the journals were so mutilated as to render them of no force in support of the contention that the bill had not been regularly enacted.

In *State v. City of Wahoo*, 62 Neb. 40, one of the questions presented was whether the silence of the senate journal upon the matter of the concurrence by that body, in an amendment by the house, would render the act invalid. The court, by Commissioner HASTINGS, say: "It is next asserted that the act of March 10, 1885, was not constitutionally passed, because it was amended in the house by inserting a repealing clause, and this was not concurred in by the senate. The journals of the house and senate are appealed to in order to sustain this contention. It is not claimed that the senate journal shows a non-concurrence in this formal amendment. It is merely claimed that an inspection of the journal fails to show a concurrence, and this is sought to be helped out by a showing that the message of the house to the senate stating the passage of the act calls attention to no amendment. We think that this condition of things hardly calls for a reversal of the lower court's finding. The holding in *State v. Frank*, 61 Neb. 679, is that the silence of the journal is not to be taken as conclusive that the act was not passed. The rehearing opinion rests that decision chiefly upon the doubtful and mutilated condition of the journal. *Hull v. Miller*, 4 Neb. 503, dwells upon the distinction between mere silence of the journals and an affirmative showing that the constitution has not been complied with. The evidence in this case certainly shows a degree of carelessness in the journals that would amply justify the court in refusing to take their mere silence against the affirmative evidence of the signed and certified acts."

In *Hull v. Miller*, 4 Neb. 503, referred to in *State v.*

*City of Wahoo, supra,* it was held that where a bill orig-
inated in and was passed by the senate, and was then
passed by the house with amendments and returned to
the senate who concurred therein, but the vote on con-
currence was not disclosed by the journal, the act was
valid. In the opinion it is said: "But it will be observed
that the provision of the constitution above quoted (the
taking and entering upon the journal of the yeas and
nays) refers only to the vote on the passage of bills.
There are numerous other votes necessary during the
progress of a bill to its third reading, to which it has no
sort of reference whatever."

In *Colburn v. McDonald,* 72 Neb. 431, it was held that
the enrolled bill, signed by the officers of both houses and
approved by the governor, as found in the office of the
secretary of state, is *prima facie* evidence of its due enact-
ment; that the journals may be looked into for the pur-
pose of ascertaining whether the law was properly
enacted, but the silence of the journals is not conclusive
evidence of the non-existence of a fact which ought to be
recorded therein regarding the enactment of a law; and
that it must be made to affirmatively appear by such jour-
nals that the act did not pass. The same rule is clearly
stated in *Stetter v. State* 77 Neb. 777, and in *Stratton v.
State,* 79 Neb. 118, where it is said: "But, where the legis-
lative journals are silent, this will not be taken as evi-
dence that the constitutional requirements were not
observed."

Other cases, no doubt, might be cited from the reports
of this state, and many more from those of other states,
but we deem it unnecessary to do so. From these cases
we deduce the rule that the duly certified act of record in
the office of the secretary of state raises the *prima facie*
presumption that all steps required by the constitution in
its passage have been duly observed and followed; that
the journals of the houses may be resorted to for the
purpose of showing affirmatively that such was not the
fact, but that the mere silence of the journal, aside from

what the constitution specifically requires it to contain, is no proof that the action was not taken. As the constitution does not require that the fact of the concurrence of the senate in the house amendment shall appear of record in the journal, the act must be presumed to have been duly passed. We therefore hold that the act of 1895 became a valid law, and that, under it, it became the duty of the state canvassing board to canvass the returns of the vote on proposed constitutional amendments.

The law as it then stood was again amended in 1897, by chapter 5 of the laws for that year, and the act of 1895 was thereby repealed. By that act (1897) it was made the duty of the county clerks to make return of the vote on constitutional amendments to the board of state canvassers "provided for in section 53 of chapter 26 of the Compiled Statutes of 1895, in the same manner and within the same time that they are, required to make return of votes cast for officers mentioned in said last-named section and all such returns shall be directed to the secretary of state and transmitted to him in a separate envelope from the one containing the abstract and return of votes cast for the officers named in said section. The returns from the election officers shall be canvassed by the county canvassing board which canvasses the other election returns in the county. The said canvassing board of the county shall foot up from the returns made by the judges and clerks of election, (1) the number of electors voting at the election, (2) the number of electors voting at said election for the amendment or amendments, (3) the number of electors who voted against the amendment or amendments, (4) the number of electors voting at said election who voted for senators, (5) the number of electors voting at said election who voted for representatives, (6) the number of electors voting at such election who voted for both senators and representatives, and shall enter their findings in the book wherein the canvass of other election returns is made and

from the findings so made the clerk shall make the returns to the state board of canvassers as hereinbefore provided." It will be observed that by this act its provisions are limited to the duties of the respective judges and clerks of election, county clerks and county canvassing boards, in the matter of the canvass of returns on constitutional amendments. Section 53 of chapter 26, referred to. in the act, provides for the canvass of the returns of votes cast for presidential electors, judges of the supreme and district courts and regents of the university, by the board of state canvassers, consisting of the governor, secretary of state, auditor of public accounts, treasurer and attorney general, but no reference is made to the subject of canvassing the vote on constitutional amendments. The act of 1897, was amended by the act approved April 6, 1907 (laws 1907, ch. 1), but no change was made, with the exception of the elimination of the fourth, fifth and sixth requirements as to the duties of the election officers and county clerks upon the same subject. We find no specific provision anywhere for the state canvass of returns of votes upon the question of constitutional amendments.

The condition of the law is that the returns from the different counties upon the subject shall be sent to the state canvassing board, and from thence they go no further. There is nothing requiring them to be sent to the speaker of the house, as in the case of the executive state officers, members of congress and United States senators, and we find no provision requiring the secretary of state or other officer to forward them to him. They are required to  be sent to the state canvassing board, and there they must rest. In this condition of the law, we are driven to seek the intention of the legislature, to be derived from what it has said as to the canvass of those returns and by whom. There can be no doubt but that it was intended that they should be canvassed by some one in order that the result of the election and choice of the people should be made known. The creation of the state

canvassing board was for the sole purpose of canvassing returns, although their specific duties were to canvass the returns mentioned in section 53 of chapter 26. The law required the returns to be sent to them. The governor was a member of that board. As we have seen, it is provided by section 4, ch. 3, Comp. St. 1907, that the returns are to be made "to the state board of canvassers" by the county clerks, and by section 5 of the same act it is the duty of the governor to issue his proclamation declaring the result of the election. When we remember that there is no other body or tribunal to whom those returns are to be transmitted, that they are required to be lodged with the state canvassing board, and not elsewhere, that they became a part of the records in the office of the secretary of state, and, so far as any provision of their removal is concerned, there they must remain, we are driven to the conclusion that it was the intention of the legislature to impose the duty of canvassing them upon that board, and that the canvass made by it was in all things legal and valid.

The claim of relator to the office in dispute is based upon the proceedings of the joint conventions of the two houses of the legislature held on the 6th and 12th day of January, 1909, and our attention is urgently directed to those proceedings. On the 6th of January (the first session) the following announcement was made by the president: "Gentlemen of the joint assembly: In accordance with the provisions of section 4, article 5 of the constitution of this state, we have met in joint convention to witness the opening and listen to the publishing by the speaker of the house of representatives of the returns of the votes cast at the general election held on the 3d day of November, 1908, for officers of the executive departments, members of Congress, railway commissioner and the vote on the constitutional amendments." Section 4, art. V of the constitution, is as follows: "The returns of every election for the officers of the executive department shall be sealed up and transmitted by the returning offi-

cers to the secretary of state, directed to the speaker of the house of representatives, who shall, immediately after the organization of the house, and before proceeding to other business, open and publish the same in the presence of a majority of each house of the legislature, who shall, for that purpose, assemble in the hall of the house of representatives.   The person having the highest number of votes for either of said offices shall be declared duly elected; but if two or more have an equal and the highest number of votes, the legislature shall, by joint vote, choose one of such persons for said office.   Contested elections for all of said offices shall be determined by both houses of the legislature by joint vote, in such manner as may be prescribed by law."

Just where or how the president obtained his authority for declaring that the convention had met for the purpose of listening to the opening and publishing of the returns of votes cast "on constitutional amendments," we are not informed.   It is clear that no such authority is given in the section of the constitution referred to or elsewhere, and it must be equally clear that the declaration of the presiding officer could not confer such authority.   The record recites: "Whereupon the speaker directed the secretary and chief clerk to open the seals of returns from the several counties of the state." It is plain that the returns of the vote on constitutional amendments were not then before the convention or in its possession, for one of the members offered the following motion: "I move that the secretary of state be required to forthwith lay before this joint convention the returns made to his office by the county clerks of the votes cast at the election in November, 1908, on the proposed amendment to the constitution of the state in reference to the judiciary." Another member moved to amend "by moving that we proceed to canvass the vote on state officers and congressmen." The convention then took a recess until 3 o'clock P. M. It reconvened at that hour, when the following amendment to the last motion was offered by another

member: "I move as an amendment that the joint convention proceed to canvass the votes for state officers and congressmen, at the election held November 3, 1908, and that the canvass of the vote on constitutional amendment relating to the judiciary be taken up and disposed of at a future joint convention of the two houses of the legislature, to be arranged for Tuesday, January 12, 1909, at 2 o'clock P. M., and, when the convention adjourn, it adjourn to that time." This substituted motion was declared carried. The original motion, as amended, was put to vote and declared carried. The secretary of state then presented the original abstracts of votes cast by the counties at the general election of November 3, 1908, for officers of the executive department and members of congress. "Whereupon the speaker directed the secretary and chief clerk to open the seals of returns from several counties of the state and on conclusion of the canvass the names of the state officers and congressmen shown to be elected by the returns." The joint convention then adjourned to Tuesday, January 12, 1909, at 2 o'clock P. M. On January 12 the joint convention reconvened, when the motion of a member requesting the secretary of state or his deputy "to forthwith lay before the joint assembly the returns made by the county clerks of the several counties to the state board of canvassers on the proposed amendments to the constitution, etc., was carried." "A letter from the secretary of state, in which he declined to grant the request of the joint convention until so directed by a court of competent jurisdiction was then read." From what follows in the record before us, we infer that there was then presented "the printed abstract of votes prepared by the secretary of state following the canvass made by the state board of canvassers," to which was appended the following certificate (with official seal attached): "I, Geo. C. Junkin, secretary of state, of the state of Nebraska, do hereby certify that the attached abstract of votes cast at the general election held November 3, 1908, is practically a true copy of the

abstract as canvassed by the state canvassing board, consisting of Governor Sheldon, Secretary of State George C. Junkin, Auditor of State E. M. Searle, Jr., State Treasurer L. G. Brian, and Attorney General W. T. Thompson."

A resolution was then offered which, notwithstanding its length, we here copy: "Whereas, the legislature of the state of Nebraska, in its thirtieth session, to wit, in the year 1907, submitted to the electors of the state two proposed amendments to the constitution of the state to be voted on by the electors at the election to be held on the 3d day of November, 1908, to wit; a proposed amendment to sections two (2), four (4), five (5), six (6) and thirteen (13) of article six (6) of the constitution of the state of Nebraska relating to judicial powers, which proposed amendment was made in a bill known as Senate File No. 386, and another proposed amendment to section nine (9), article eight (8) of the constitution of the state of Nebraska, relating to the investment of funds of the state for educational purposes, which last mentioned amendment was made in a bill known as Senate File No. 163, both of which bills were duly passed by said legislature, and said amendments thereby submitted to the electors of the state to be voted on at said election on November 3, 1908; and Whereas, said election was held and the said amendments voted on at said election and the canvass thereof made by the election officers in the several counties, and the county canvassing boards of the several counties canvassed the votes on said amendments in their respective counties, and the county clerks of the several counties transmitted the returns to the state board of canvassers as provided by law; and Whereas, said returns on said amendments are now on file in the office of secretary of state as required by law and are in his custody as such secretary of state; and Whereas, there was no authority in the state board of canvassers to canvass the returns of the votes on said two proposed amendments to the constitution of the state; and Whereas, this

joint convention of the thirty-first session of the legisla-
ture of the state of Nebraska has met in accordance with
the provisions of the constitution and the laws of this
state for the purpose of canvassing the vote on said two
propositions to amend the constitution and has duly de-
manded of the secretary of state in whose custody the
returns of the several county clerks aforesaid are, and
the secretary of state has refused to produce to this con-
vention the said returns; and Whereas, there has been
produced before this joint convention a duly certified
copy of the records in the office of secretary showing the
number of electors who voted at said election, the num-
ber of electors who voted for the said amendments sepa-
rately and severally, and the number of electors who voted
against said amendments separately and severally, which
certificate is under the hand of the secretary of state with
the great seal of the state of Nebraska thereto attached;
and Whereas, it appears from the returns made to the
state canvassing board that the number of electors voting
at said election at which said amendments were sub-
mitted, to wit, on the 3d day of November, 1908, was
271,491, and the number of electors at said election who
voted for the proposed amendment first mentioned above,
to wit, the amendment to section two (2), four (4), five
(5), six (6) and thirteen (13) of article six (6) of the
constitution of the state of Nebraska relating to judicial
powers was 214,218, and the number of electors voting
at said election against said last mentioned proposed
amendment was 16,271; and the number of electors vot-
ing at said election for the proposed amendment to sec-
tion nine (9) of article eight (8) of the constitution of
the state of Nebraska was 213,000 and the number of
electors voting at said election against said last named
amendment was 14,395: Now, therefore, it is hereby
declared, found and made of record in these joint pro-
ceedings by this joint convention from the records in the
office of secretary of state relating to said election of
November 3, 1908, and from the certified copy aforesaid,

that at said election 271,491 electors voted; that at said election 214,218 electors voted for the proposed amendment to sections two (2), four (4), five (5), six (6) and thirteen (13) of article six (6) of the constitution of the state of Nebraska, and that 16,271 electors voted against said last proposed amendment to the constitution; that at said election on November 3, 1908, 213,000 electors voted for the amendment proposed to section nine (9) of article eight (8) of the constitution of the state of Nebraska relating to the investment of funds of the state for educational purposes, and that at said election 14,395 electors voted against said last-mentioned proposed amendment to the constitution. And it is further declared that by virtue of the power reposed by the constitution and laws of this state in this joint convention of the house of representatives and members of the senate of the state of Nebraska, and the canvass by this joint convention of the election held on the 3d day of November, 1908, within and for the state of Nebraska, the proposed amendment to the constitution submitted to the electors of the state by Senate File No. 386 and relating to judicial powers was duly adopted by the electors of the state and has thereby become a part of the constitution of this state; and that the proposed amendment to the constitution of the state submitted in Senate File No. 163 aforesaid was at said election held on November 3, 1908, duly adopted by the electors of the state and that amendment has also become a part of the constitution of this state."

"The following motion was offered: 'I move the foregoing be entered of record as the judgment of this joint convention.' Upon request of representative Nettleton the roll was called. Twenty senators voted in the affirmative, thirteen in the negative. Fifty-four representatives voted in the affirmative and thirty-six in the negative. Ten members of the house were absent or excused. Mr. Taylor of Custer explained his vote as follows: 'The returns are not here. This canvass is not in accordance with section four (4) article five (5) of the constitution.

This is not a constitutional canvass. Therefore I vote, "No." W. J. Taylor.' There being seventy-four affirmative votes and fifty negative votes on joint ballot, the president declared Mr. Ransom's motion carried. On motion of Mr. Stoecker the convention adjourned."

These proceedings lead us to inquire as to the duties and powers of the joint convention. For this purpose we again refer to the section of the constitution above quoted. The whole duty of opening and publishing returns is devolved upon the speaker. The only obligation upon the members of the two houses, in so far as that duty is concerned, is that they (a majority of each house) shall be present. The person having the highest number of votes for either of said offices shall be declared duly elected; but, if two or more have an equal and the highest number of votes, the legislature shall, by joint vote, choose one of such persons for said office. This appears to be the sole active duty of the convention. It is the duty of the speaker alone to open and publish the returns. The act is especially enjoined upon him by law as a duty resulting from his office as speaker. It is a ministerial duty positively imposed by law, in regard to which he is vested with no discretionary power. The joint convention has no power or authority to postpone the discharge of his duty to another or later time. He can be compelled by mandamus to proceed at once to discharge the duty imposed upon him. These propositions are fully settled and determined in *State v. Elder,* 31 Neb. 169, and dispose of the contention that the act of opening and publishing the returns is legislative, and not ministerial. It is true that the conferring of the power or authority to open and publish the returns is legislative, that is, there must be some law first enacted by the people or legislature conferring that power, but that must be general in its application, and is no part of the opening and publishing of the returns, which all authority holds to be ministerial.

It must also be clear to every one who reads that the

joint convention has no legislative power. It cannot enact laws, nor create duties where none existed before. The resolution directing the secretary of state to produce the returns was a void act. That duty could only be imposed by a legal enactment introduced and passed as all laws are enacted. If the secretary of state refuses or fails to produce the returns which he is required by law to produce and submit to the speaker, he can be compelled by mandamus to perform the required act; but the joint convention cannot create the duty, nor canvass election returns or declare the result, as assumed in the foregoing preamble and resolution.

It must be conceded by all that the returns of the vote on the constitutional amendments were never in the hands of the speaker. If it had been the duty of the secretary of state to put them there, the courts were open, and the discharge of the duty could have been compelled. The evidence which the speaker had was a certificate of the secretary of state that the printed abstract of votes upon which the speaker acted was "practically a true copy of the abstract as canvassed by the state canvassing board." Not the returns, nor indeed a copy thereof, but *"practically"* a copy of the result of the work of the state board of canvassers. If their canvass was void, their abstract would be equally so and furnish no basis upon which the speaker could act. If the abstract was not void, it was because the board of canvassers had the right to make it, and their acts were legal. When the speaker had opened and published the returns which by law it was his duty to open and publish, and had declared the persons elected to the several executive offices, his duties were at an end, and nothing further was to be done. The adjournment at that time terminated the work of the convention.

For the reasons here stated, and many others not necessary to be here noted, we are forced to concede the truth of the statement of representative Taylor of Custer, when casting his vote, that the canvass was not in accordance

with the constitution, and that it was not a constitutional canvass. We therefore hold that the whole proceeding and all that followed thereafter and based thereon was without authority of law and void; that the proclamation and appointment of the governor following were of no validity; that the canvass by the state board of canvassers, the proclamation and appointments thereunder were valid; and that the respondent, James R. Dean, is entitled to hold the office of judge of the supreme court.

The relation is dismissed, and the judgment will be in favor of the respondent.

JUDGMENT FOR RESPONDENT.

ROSE and DEAN, JJ., not sitting.