WINFIELD M. ELMEN, RELATOR, v. STATE BOARD OF EQUALIZATION AND ASSESSMENT ET AL., RESPONDENTS: BOARD OF REGENTS OF THE UNIVERSITY, INTERVENER.

FILED JULY 10, 1930. No. 27412.

*Winfield M. Elmen, pro se.*

*C. A. Sorensen, Attorney General, George W. Ayers* and *Clifford L. Rein,* for respondents.

*Henry H. Foster,* for intervener.

*Peterson & Devoe, amici curiæ.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

EBERLY, J.

This is a proceeding in equity instituted in this court by a taxpayer, as relator, against the state board of equalization and assessment, of which Honorable Arthur J. Wea-

ver, governor, Honorable Frank Marsh, secretary of state, Honorable L. B. Johnson, state auditor, Honorable W. M. Stebbins, state treasurer, and Honorable Harry W. Scott, state tax commissioner, are members, and joining Honorable L. B. Johnson in his capacity as state auditor, respondents.

The petition set forth in appropriate language the ultimate facts upon which relief is claimed, the gist of which is:

That, pursuant to the Constitution, there was submitted to the forty-fifth session of the legislature of Nebraska by the chief executive a complete itemized budget of the financial requirements of all departments, institutions and agencies of the state. A copy of this budget message, attached as an exhibit, constitutes a part of this pleading.

That thereafter appropriation bills carrying the identical items contained in the budget message were duly introduced in the house of representatives and there designated as house rolls 280 and 281. That, "notwithstanding the limitations of the Constitution of the state of Nebraska prohibiting the appropriation of money in excess of the recommendation contained in said budget unless by a three-fifths vote of each house of the legislature, the two houses of the legislature attached to house roll 280 certain amendments without such three-fifths vote of each house, and thereby undertook to increase the appropriations shown by said amended bill." That house roll 280, thus amended, was finally passed and adopted, by concurrence in the conference committee report thereon, "by an affirmative vote of 32 members of the senate, no negative vote being cast," and was likewise passed and adopted by the house of representatives "by an affirmative vote * * * of 82, with no negative votes cast, and with 28 (18?) members absent," but that no separate vote by roll call was had and recorded on the respective separate increases in the respective items as recommended by the governor in his message. A copy of house roll 280, with amendments made thereto, is also attached to and forms a part of the petition.

We take judicial notice of the fact that house roll 280, thus amended, was presented to the governor for approval or rejection on the 24th day of April, 1929, at 11:57 a. m. and immediately thereafter on said day both the senate and house of representatives adjourned *sine die*.

The relator further alleges that house roll 280 containing such increases thus passed was filed in the office of the secretary of state of Nebraska, together with the veto message of the governor, which in paragraphs 1 to 14, inclusive, disapproved certain items thereof, some wholly and some in part only, thus leaving certain increases made by legislative amendments in full force and effect. The relator also alleges that no separate vote was had or recorded in either house of the legislature on the respective separate increases contained in house roll 280 as finally adopted, as required by the terms of the Constitution, and that therefore no increase above and in excess of the recommendations of the governor were in fact and in law made; that the state auditor and the state board of equalization and assessment have heretofore erroneously determined that the governor's veto was valid and effective as to the items of house roll 280 to which it relates, but notwithstanding the modification occasioned by such veto house roll 280 as finally adopted and thus modified still contains increases of items over and above the recommendations of the governor's budget message, none of which were constitutionally enacted, and which the governor had no power to validate and are therefore void, and which said state board has heretofore determined constitutes a proper basis for assessment, and this board will, unless enjoined, determine the tax levy for the present year on that basis.

The board of regents, a corporation, intervened in the proceeding, and in its petition filed in the case adopts and amplifies the ultimate facts pleaded by the plaintiff, but dissents from the plaintiff's interpretation of the constitutional provisions relating thereto. It is alleged in substance in its behalf that appropriations for the benefit of the intervener as recommended in the budget message were by the legislature lawfully increased over and above the bud-

get recommendations of the governor; that a separate three-fifths vote on each separate item of increase is not a requirement of the Nebraska Constitution, but that house roll 280, after having been duly amended, received more than three-fifths vote in each house at the time of its final passage and adoption, and that thereby the constitutional mandate applicable to the situation was that these provisions having been adopted by more than three-fifths vote in each house were within the protection of section 7, art. IV of the Constitution of Nebraska, which provides that "such excess (constituting increases of budget recommendations) so approved by a three-fifths vote shall not be subject to veto by the governor;" and that therefore the governor's veto as to the items of appropriation contained in said bill in favor of the intervener was without legal force and effect and the items of appropriation contained in house roll 280 thus adopted are each and all valid and existing appropriations, notwithstanding the attempted veto.

The respondents joined issue by a general demurrer directed to the petition of relator based on the ground that his petition does not state facts sufficient to state a cause of action, and likewise by a demurrer to intervener's petition based on the same ground, and to which was added an additional reason that "the said intervener has not legal capacity to sue in the manner and form and for the purposes in its said petition of intervention stated."

For convenience we will classify items of appropriation in dispute herein as classes A, B, and C, and will refer to the communication which accompanied house roll 280 when it was returned by the governor and filed in the office of the secretary of state within five days after the adjournment of the legislature as the "veto message."

First, class A will include items of appropriation contained in house roll 280 as finally adopted, for which the governor's budget message carried no recommendations, but which were added by the legislature, totaling the sum of $165,000, and which were each wholly and separately disapproved in paragraphs 1, 2, 3, 4, 6, 12, and 14 of the veto message.

Class B relates to items of appropriation in house roll 280, for each of which the governor's budget message contained definite recommendations as to amount, but which amounts thus recommended were each increased by the legislature, so that the sums, including the increases thus made, total $5,415,000. These items are each, in part only, separately disapproved by the governor's veto message in paragraphs 5, 7, 8, 9, 10, 11, and 13 thereof. As to all save the seventh paragraph, the disapproval or veto extends to and coincides with the increase over and above the budget recommendations. As to paragraph 7, a portion only of the increase of the items of appropriations therein referred to thus made is disapproved. The remainder of the increase is impliedly, though not expressly, approved. By this veto of these separate items a reduction of $330,500 is sought to be effected.

Class C refers to items of appropriations contained in house roll 280 which in effect increased the items of maintenance of the board of control by $112,500. This the governor, for reasons stated, expressly approved, or rather stated, "I deem it necessary to allow this increase made by the legislature, to stand."

The basic foundation of relator's contention is the proposition that section 7, art. IV of the Constitution, as amended in 1919-1920, requires the governor to fix the maximum of the budget items in his budget message; and that an increase can be made only by a three-fifths vote of the houses of the legislature, and that the three-fifths vote thereby required is a separate three-fifths vote on each item of increase; and that a three-fifths vote had in each house on final passage and adoption of the bill therein is insufficient under the terms of the constitutional provision referred to. It is conceded by all parties in the instant case that, while the final adoption of house roll 280 was by a substantially unanimous vote, there was "no separate three-fifths record vote on each item of increase."

The respondents, it seems, accept in part the construction thus contended for, but do not agree as to the legal result of failing to have a separate three-fifths vote on each

item of increase, and contend for the validity of the appropriations as reduced by the governor's veto.

Intervener's position is that the words of the Constitution referred to are plain, that no resort to implication is necessary, and where in both houses a "whole bill" has been passed and adopted by a three-fifths record vote, necessarily each of the parts thereof has been thus passed and adopted.

It appears that the constitutional convention of 1919-1920 framed an amendment to section 7, art. IV of the Constitution of 1875, then in force, which was submitted to and adopted by the electors, and there was thereby included in our present fundamental law the following: "At the commencement of each regular session (the governor) shall present, by message, a complete itemized budget of the financial requirements of all departments, institutions and agencies of the state for the ensuing biennium. * * * No appropriations shall be made in excess of the recommendation contained in said budget unless by three-fifths vote of each house of the legislature, and such excess so approved by a three-fifths vote shall not be subject to veto by the governor."

In this connection it is to be remembered that a principle of constitutional construction early adopted by the courts and almost universally observed is: "The (state) Constitution is a limitation upon the powers of the legislative department of the government; but it is to be regarded as a grant of powers to the other departments. Neither the executive nor the judiciary, therefore, can exercise any authority or power, except such as is clearly granted by the Constitution." *Field v. The People*, 3 Ill. 79.

Indeed, this court, in harmony with the controlling principles just stated, early announced the doctrine, which has ever since been the uniform holding of this tribunal: "The (state) Constitution is not a grant but a restriction of legislative power." *Magneau v. City of Fremont*, 30 Neb. 843; *State v. Moores*, 55 Neb. 480.

And as applied to the subject of this lawsuit: "The taxing power vested in the legislature is without limit, except such as may be prescribed by the Constitution itself." *State*

*v. Lancaster County,* 4 Neb. 537; *State v. Dodge County,* 8 Neb. 124; *Shaw v. State,* 17 Neb. 334; *Darst v. Griffin,* 31 Neb. 668; *State v. Lansing,* 46 Neb. 514, 530; *Mercantile Incorporating Co. v. Junkin,* 85 Neb. 561; *Whitla v. Connor,* 114 Neb. 526.

And we have also announced the doctrine: "The courts can enforce only those limitations which the Constitution imposes, and not those implied restrictions which, resting on theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives." *State v. Lancaster County,* 4 Neb. 537.

Indeed, a careful consideration of the briefs and arguments of counsel at the bar discloses no serious controversy as to the principles of construction applicable to the matter here for determination, viz., "In the main, the general principles governing the construction of statutes apply also to the construction of Constitutions." 12 C. J. 699; *Mercantile Incorporating Co. v. Junkin,* 85 Neb. 561. The words and terms of a constitutional provision, like those of a statute, are to be interpreted and understood in their most natural and obvious meaning, unless the subject indicates or the text suggests that they have been used in a technical sense. *Hamilton Nat. Bank v. American Loan & Trust Co.,* 66 Neb. 67. Also, "Courts may not supply what they deem unwise omissions, nor add words which substantially add to or take from the Constitution as framed." 12 C. J. 707, notes 21, 33, and 34; 25 R. C. L. 963, note 4; *State v. Reneau,* 75 Neb. 1; *Siren v. State,* 78 Neb. 778; *State v. School District,* 99 Neb. 338; *In re Estate of Bayer,* 116 Neb. 670. Also, "The Constitution as amended must be construed as a whole." *Hooper Telephone Co. v. Nebraska Telephone Co.,* 96 Neb. 245. And, "Where the words of a statute are plain, direct, and unambiguous, no interpretation is needed to ascertain their meaning; a mere reading will suffice." *Stoppert v. Nierle,* 45 Neb. 105; *State v. Heupel,* 114 Neb. 797. And, finally, in the construction of a statute, "No sentence, clause or word should be rejected as meaningless or superfluous, if it can be avoided." *Hagen-*

*buck v. Reed*, 3 Neb. 17; *State v. City of Lincoln*, 101 Neb. 57.

But, in addition to the principles of construction just enumerated, which appear to be accepted without controversy by the parties to this litigation, it seems we are justified in taking judicial notice of proceedings in the constitutional convention and of the contents of the journals of the house of representatives and of the senate. *State v. Frank*, 60 Neb. 327; *State v. Frank*, 61 Neb. 679; *State v. Dean*, 84 Neb. 344. And while we regard legislative construction, although not necessarily conclusive upon the judicial department, as entitled to great weight when deliberately given, and especially when adhered to consistently for a considerable period of time (*Jackson v. Washington County*, 34 Neb. 680; *Missouri P. R. Co. v. State*, 248 U. S. 276), we are also inclined to the view: "The construction placed upon a statute (or constitutional provision) by the officers whose duty it is to execute it is entitled to great consideration, especially if such construction has been made by the highest officers of the executive department of the government, or has been observed and acted upon for many years, and such construction should not be disregarded or overturned unless it is clearly erroneous." 36 Cyc. 1140; *State v. Holcomb*, 46 Neb. 88; *State v. Sheldon*, 78 Neb. 552; *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111; *State v. Bryan*, 112 Neb. 692.

Observing the order of time, it appears that the controlling budget provision before us was first discussed in the constitutional convention of 1919-1920. In this discussion by those who framed and submitted it to the electorate for ratification, it appears that the members of the convention were fully advised of the fact apparently conceded in its debates that, under its provisions, "three-fifths of the members of the house and three-fifths of the members of the senate could vote any amount of money they might see fit," and that as to increases of budget recommendations made by a three-fifths vote "the veto power of the governor will not apply." Proceedings of the Constitutional Convention 1919-1920, p. 2078.

In the address to the people submitted as explanatory of the proposed amendments and authorized as such by the constitutional convention itself appears in substance the following with reference to this budget amendment: "The difference is that under the budget the governor must announce his position before the legislature acts, while, under the present Constitution, the governor may veto after the legislature acts." And the assurance was expressly given that "the proposal does not increase the powers of the governor." Proceedings of the Constitutional Convention 1919-1920, p. 2843. And it is also to be noted in this connection that the constitutional convention also submitted an amendment to section 13, art. III of the Constitution, which in terms provided: "No amendment to any bill by one house shall be concurred in by the other nor shall the report of any conference committee as to any bill be adopted by either house except by the assent of the same number of members as is required for the passage of the original bill taken by yeas and nays entered upon the journal."

We are indebted to the suffrage of the people for the adoption of all amendments submitted and indeed for the adoption of the original Constitution which such amendments changed. From this fact it is patent that, where the language employed is plain, the courts should accord to it the meaning which obviously would be accepted by the layman. In the instant case, taking into consideration that section 11, art. III of our present Constitution, is as it was in the Constitution of 1875, unchanged, and provides among other things that "Each house shall keep a journal of proceedings * * * and the yeas and nays of the members on any question, shall at the desire of any two of them be entered on the journal. All votes in either house shall be *viva voce*." That section 13, art. III of the Constitution, which was submitted by the constitutional convention of 1919-1920, as adopted, provides: "No law shall be enacted except by bill. No bill shall be passed by the legislature unless by the assent of a majority of all members elected to each house of the legislature, and the question upon final passage shall be taken immediately upon its last reading

and the yeas and nays shall be entered upon the journal. No amendment to any bill by one house shall be concurred in by the other nor shall the report of any conference committee as to any bill be adopted by either house except by the assent of the same number of members as is required for the passage of the original bill taken by yeas and nays entered upon the journal." And it further appears in section 7, art. IV of the Constitution, that there is no express provision therein contained that there shall be a separate three-fifths record vote on each item of increase, but merely that "no appropriations shall be made in excess of the recommendation contained in such budget unless by three-fifths vote." What logical basis is afforded by the foregoing which would justify any conclusion on the part of the elector whose vote adopted the provision in question save and except that, where budget appropriations when adopted as a result of concurrence in a conference committee report, such procedural action by the legislature would be governed and controlled by the terms of the constitutional amendment adopted at the same election which provided: "No amendment to any bill by one house shall be concurred in by the other nor shall the report of any conference committee as to any bill be adopted by either house except by the assent of the *same number of members as is required for the passage of the original bill* taken by yeas and nays entered upon the journal." Const. art. III, sec. 13. (Italics ours.) Indeed, subsequent events disclose that the construction suggested was adopted by both the legislative and executive departments of the state government. It appears that thereafter the governors of this state then in office, in compliance with the budget provisions referred to, submitted to the forty-first, forty-second, forty-third, forty-fourth, and forty-fifth sessions of the legislature of the state of Nebraska complete itemized budgets of the financial requirements of all departments, institutions, and agencies of the state for the ensuing biennium; that at each of the sessions referred to, upon due consideration by each of the separate houses, as provided by the Constitution, certain of these items were increased in excess of the budget recommendations; that in

none of these instances was there a separate record vote on each item of increase. In all of them the legislation was finally adopted by three-fifths vote in the manner provided by section 13, art. III of the Constitution. It further appears that each of the chief executives concerned, except our present governor, not only accepted the appropriations thus made as having been adopted in full compliance with the constitutional provisions, but also in no manner challenged the validity or regularity of legislative procedure connected therewith.

This has also been true as to all administrative officers designated by law to deal therewith and disburse the same. In view of responsibilities involved, this is particularly striking when the acts of the state auditors are considered. The Constitution of Nebraska and laws made pursuant thereto expressly provide that, upon the adjournment of each session of the legislature, the then state auditor shall determine the aggregate amount of the appropriations made and prepare or cause to be prepared a certified statement of all appropriations made by such legislature, also a full statement of the expense of such legislative sessions, and publish the same in the manner provided by law in one of the three daily papers having the largest circulation in the state. Thus this officer, in compliance with the duties prescribed by the Constitution and statutes, necessarily, not only determined the validity of the legislative appropriation acts in question, but in a public manner advised the electors and taxpayers of this state of the determination thus made, and as auditor thereafter, in connection with the secretary of state, duly allows the claims payable therefrom. He thereby necessarily determined that there was, not only a valid claim against the state, but also a valid appropriation from which the same could be paid. Const. art. VIII, sec. 9; Comp. St. 1922, sec. 3157; *State v. Wallichs*, 14 Neb. 439; *State v. Moore*, 37 Neb. 507. Indeed, it cannot be said that the present governor of Nebraska has in fact denied the validity of the appropriations thus made, for he permitted certain of these increases "to stand." A careful consideration of the budget amendment without reference

to the other provisions of the Constitution of the state confirms us in the opinion that the language employed is "plain, direct, and unambiguous," and that no interpretation is necessary to ascertain its meaning. We are also convinced that, construed as a limitation upon legislative power, the words of this amendment are binding in what they fail to express as well as that which they expressly enjoin, and this court may not supply what it might deem unwise omissions, or add words which substantially add to or take from the Constitution as framed and adopted. There being no limitation expressed to the effect that there must be a separate three-fifths record vote on each budget item increased, we are not justified in extending the force and effect of this amendment beyond the precise words it contains.

This conclusion is also supported by the consistent and continued interpretation which the legislative branch of this state has given the provisions under consideration and which was in entire harmony with the construction given it by all of the executive and administrative officers of this state, save and except the contentions first made by the respondents in this case after the adjournment, *sine die,* of the forty-fifth session of the legislature. It is to be remembered that one of the great objects of government is security and peace, which includes stability, by which is meant, not only absence of revolution, but also the certainty of rights of legal as well as political relations. As already suggested, we find no substantial question of doubt involved in the constitutional provision here controlling. But even if we assume that such a question is actually presented, the conclusion announced would still remain the same. Thompson, J., of this tribunal in the case of *State v. Bryan,* 112 Neb. 692, applicable alike to constitutional provisions as well as statutes, states the rule as follows: "That construction of a statute of doubtful meaning given it by those whose duty it is to enforce it, and which construction the legislature has by its continued non-interference for a number of years acquiesced in, will be approved, unless as thus construed it contravenes some provision of the Constitution, or is clearly wrong." In support of this there is cited

in the opinion the case of *State v. Sheldon,* 79 Neb. 455, in which the rule is announced: "When a statute has for nearly 40 years been practically construed by the officers whose duty it is to enforce it, and has during that time been several times reenacted by the legislature in substantially the same terms, such construction will be regarded as adopted by the legislature, although the language of the statute would indicate a different meaning." So, too, this court is committed to the doctrine that "The governor is a part of the lawmaking power, and, in acting on bills presented to him for his approval or rejection, he is engaged in the performance of a legislative duty enjoined upon him by the Constitution." *Weis v. Ashley,* 59 Neb. 494; *State v. Junkin,* 79 Neb. 532. It is also patent that in this regard the effect of the amendment of 1919-1920, now forming a part of section 7, art. IV of the Constitution, is to modify, but not extend or increase, the legislative function and duties with which the chief executive is invested. Its provisions therefore are fairly within the purview of section 1, art. II of the Constitution, and governed by the rule of construction there announced: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, *and no person* or collection of persons *being one of these departments, shall exercise any power properly belonging to either of the others except as hereinafter expressly directed or permitted."* (Italics ours.)

This court, therefore, is unanimously of the opinion that the legislative practice in the passage of the budget bills disclosed in the present record, wherein items recommended by the chief executive have been increased in excess of the recommendations thus made, is in substantial compliance with limitations expressed in section 7, art. IV of the Constitution of Nebraska.

Having determined that house roll 280 was constitutionally enacted, the relator's contention may not be sustained, and the field of controversy as between the intervener and the respondents is narrowed to the single question: Are increases properly made in a budget bill subject to the veto of the chief executive?

The history of the provisions relating thereto indicate the negative. In the first Constitution (1866) of this state section 19, art. II, executive, conferred on the governor a veto power almost identical with that conferred on the president by the Constitution of the United States. It applied alike to all legislation and under it there could be no veto of an item in an appropriation bill. In the Constitution of 1875 the veto power is defined in section 15, art. V, which with certain amendments continued the provisions of the Constitution of 1866 in force, but adds thereto a provision empowering the governor to disapprove any items of appropriation contained in bills passed by the legislature. The amendment of section 7, art. IV of the Constitution, which we have heretofore discussed and interpreted, is limited by its express terms in its application to "the financial requirements of all departments, institutions, and agencies of the state." It is manifest that there are certain appropriations that are not within but outside of the limitations thus expressed. As to the appropriations made pursuant to the budget and passed, but which have been amended by the legislature so as to exceed the recommendations contained in the budget message and such excess approved by three-fifths vote, this amendment provides that such appropriations "shall not be subject to veto by the governor."

The rule of construction applicable to the situation is: "When general and special provisions of a Constitution are in conflict, the special provisions should be given effect to the extent of their scope, leaving the general provisions to control in cases where the special provisions do not apply." 12 C. J. 709; *People v. Cassiday,* 50 Colo. 503; *State v. Harris,* 77 Ohio St. 481; *City of San Antonio v. Toepperwein,* 104 Tex. 43.

In the instant case, the more general provision is section 15, art. IV of the Constitution, which deals in general terms with the governor's veto power. The more particular provision is section 7, art. IV of the Constitution, which deals with one restricted class of appropriations. Section 7, art. IV, is a later provision than section 15, art. IV. Section 7, together with statutes in aid thereof, sets up a complete

system of dealing with the financial requirements of all departments, institutions, and agencies of the state from the initiatory recommendations of a department or institutional head or board to final enactment of the appropriations. Indeed, giving full effect to the provision of the amendment adopted in 1920 as a "special provision" should put the whole controversy at rest as to classes A, B and C, as heretofore defined, for it includes within it the words "shall not be subject to veto by the governor."

We are confirmed in the view therefore that all the provisions of house roll 280 in controversy which in effect increase the amount of the recommendations contained in the governor's budget message having been properly passed under the mandate of the Constitution of Nebraska, as amended, "shall not be subject to veto by the governor." It follows therefore that, as to these items therein disapproved, the attempted veto is unauthorized, wholly void, and of no effect, and the provisions of house roll 280 as finally passed by the senate and the house remain in law in full force and effect wholly unaffected thereby.

But the right to prosecute these proceedings in equity is challenged by the respondents on the ground that a statutory right of review forms a complete remedy at law. They cite in support of their contention the concluding portion of section 5901, Comp. St. 1922, which provides: "From any final decision of the state board of equalization and assessment, any person, county or municipality affected thereby may prosecute a writ of error to the supreme court." However, this provision must be construed in connection with sections 5898 to 5904, inclusive, Comp. St. 1922, relating to the state board of equalization and assessment; section 28, art. IV of the Constitution, and section 5827, Comp. St. 1922. It will be observed that section 5901, Comp. St. 1922, is wholly devoted to the subject of the equalization of assessments and procedure prescribed therefor, including provisions for review of the final determinations therein made. It would seem, in view of all the provisions referred to, that the concluding portion of section 5901, Comp. St. 1922, must be limited to proceedings contemplated and reg-

ulated by this section. The determination of the "rate of taxation" is not one of the subjects treated in section 5901, Comp. St. 1922. The subsequent section, 5904, which was amended by chapter 173, Laws 1927, provides: "The state board shall make a levy of state taxes for the general fund throughout the state after having determined the rate of taxation upon all taxable property in the state, except intangible property otherwise taxed, in the following manner: The levy shall be based on the valuation of all taxable property as of record in the office of the tax commissioner for the year in which the levy is made. The board shall determine the fixed appropriations from the general fund from the statement of the auditor of public accounts as provided by section 3157," Comp. St. 1922.

Section 3157, Comp. St. 1922, in the light of the constitutional mandate relating thereto, requires the auditor of public accounts within sixty days after the adjournment of a session of the legislature to prepare "a certified statement of all appropriations whatever made" by such session of the legislature, "and also a full statement of the expenses of such legislative session, specifying the amount of each item and to whom and for what paid." This statement, the statute directs, shall be published in one of the three daily papers having the largest circulation in the state. The statute before us presents two questions involving serious doubt: First, is not the review provided for limited to final decisions of the state board of equalization and assessment in matters pertaining to the equalization of assessments? and, second, can the right of review have any application whatever to the matter of determining "the rate of taxation upon all taxable property in the state?" Particularly is this a problem in view of the fact that by the terms of the statute the state board is limited in its determination of the "fixed appropriations from the general fund from the statement of the auditor of public accounts as provided by section 3157."

It is true that a copy of the statement of the auditor forms a part of the petition of the relator, and from it we may determine that the state auditor in 1929 certified, so

far as the appropriations in controversy in this action are concerned, the amounts and items of appropriation as reduced by the governor's veto, and to that extent has erred. This error, it appears, adversely affected certain appropriations, as we have determined herein, lawfully made for the benefit of the university of Nebraska. There was therefore a present existing legal wrong at the time intervener filed his pleadings herein. This wrong intervener is entitled to have remedied, and for that purpose to have the certified "statement of the auditor of public accounts as provided by section 3157," Comp. St. 1922, and such other necessary proceedings connected therewith or based thereon corrected to conform to the facts and law here determined. Intervener is also entitled to have the "rate of taxation" determined by the board of equalization form a proper consideration of this corrected certificate and to have the rate of taxation fixed at such amount as will provide funds sufficient to cover all sums legally appropriated for the benefit of the university of Nebraska. In connection with this it may be noted that whether the "statement of the auditor of public accounts" referred to are by the terms of the statute to be considered as *prima facie,* or as conclusive on the board of equalization and assessment, we do not determine. So far as the parties to this litigation are concerned, however, the ultimate facts required to be shown by the auditor having been adjudicated upon demurrer of the respondents, it would seem that so far as the present case is concerned the certified statements of the auditor made in compliance with the findings of fact and law herein would be conclusive upon the respondents as the board of equalization in determining "the fixed appropriations from the general fund." It would follow that no plain, certain, and adequate remedy at law exists, and intervener is entitled to proceed in equity for appropriate relief. We are also of the opinion that in consideration of the issues involved, intervener possesses the necessary capacity to maintain this action. The respondents' demurrer to intervener's petition must be and is therefore overruled, and intervener is entitled to such other relief as herein indicated.

In view, however, of the nature of the proceedings before us, the commendable motives, and the perfect good faith of all parties hereto, no further formal order will be entered herein at this time, provided, however, in the event of any default, failure, or refusal of the respondents or any of them to accord intervener the rights to which it is entitled under the determination herein made, permission is granted to file appropriate supplemental proceedings herein.