**MOGIS v. LYMAN–RICHEY SAND
& GRAVEL CORP.**

No. 14182.

United States Court of Appeals
Eighth Circuit.

May 18, 1951.

Einar Viren, Omaha, Neb. (Swenson, Viren & Turner, Omaha, Neb., on the brief), for appellant.

Leo Eisenstatt and Yale C. Holland, Omaha, Neb. (Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., on the brief), for appellee.

Before COLLET and STONE, Circuit Judges, and DELEHANT, District Judge.

DELEHANT, District Judge.

This action is before the court on an agreed statement of the case as provided by Rule 76 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Appellant, plaintiff (who will hereinafter be referred to as plaintiff), brought the action in the district court both for himself, in respect of operations by him, as a motor carrier, and as the assignee of eight other motor carriers of certain commodities to collect undercharges allegedly due from appellee, defendant (which will hereinafter be referred to as defendant), for the transportation of sand and gravel. Plaintiff and each of his assignors are citizens of the State of Nebraska, and defendant is a corporation organized under the laws of Delaware. The matters in controversy between plaintiff and defendant, and, prior to the assignments, between each of plaintiff's assignors and defendant, severally exceed the sum of $3,-000.00, exclusive of interest and costs. Jurisdiction, therefore, was properly found, and is conceded, to exist. Title 28 U.S. C.A. § 1332(a) (1).

Plaintiff's petition, with respect to his individual claim, to the extent of its present relevancy, alleges (and comparable allegations are made in each of the several counts resting on assigned claims) that plaintiff is a common carrier by motor vehicle engaged in the business of transportation for hire of sand, gravel, crushed stone, and other similar materials in commerce within the State of Nebraska and is authorized by virtue of a Certificate of Public Convenience and Necessity issued by the Nebraska State Railway Commission so to operate over certain designated routes within the state; that the rates to be charged for the transportation of the designated materials in commerce by motor carriers within the state are subject to and governed by the regulations of the Nebraska State Railway Commission in pursuance of authority derived by that body from the provisions of Article IV, Section 20, of the Constitution of the State of Nebraska and statutes enacted in furtherance thereof; that the rates which were applicable to the transportation here involved and in effect on the dates significant in this action were set forth in what, for our purposes, may be referred to

simply as Official Motor Vehicle Tariff No. 3, together with the several amendments thereto as effective August 15, 1945 having the total consequence of increasing authorized rates thirty per-cent above the rates prescribed in original tariff No. 3; that the defendant is engaged in the business of quarrying, producing and processing sand, gravel and crushed stone within the State of Nebraska and selling those materials to users within the state; that during the period from September 15, 1945, to April 5, 1949, the defendant hired plaintiff to transport sand, gravel and crushed stone from various sand and gravel pits of defendant located in the valley of the Platte River in Nebraska to sundry locations in Douglas and Sarpy Counties, in Nebraska, as ordered and directed by defendant, all of which transportation was duly performed by plaintiff; and, finally, that defendant has refused, after demand, to pay for such transportation at the rates prescribed in Official Motor Vehicle Tariff No. 3, as amended, but, instead, has paid plaintiff specified sums less than the rates promulgated by that tariff. Plaintiff's complaint then prays for judgment based upon the amounts by which the rates allegedly prescribed by the commission exceed the amounts actually paid by defendant.

The total sum thus prayed for under all of the counts is $138,000.00, together with costs of suit, including a reasonable attorney's fee. That figure represents treble damages in respect of the several alleged undercharges allowable under Section 59–821, R.S.Neb.1943, as amended, if the payment by defendant of sums less than the rate set forth in the tariff constitutes a rebate under Section 59–817, R.S.Neb. 1943, as amended, which fact plaintiff also alleges. Upon that contention, plaintiff's right to a reasonable attorney's fee also depends.

Defendant's answer sets forth, in general, four grounds of defense, namely, that plaintiff and his assignors were not common carriers by truck, that they did not come into court with clean hands, that the Nebraska State Railway Commission never enforced the rates urged by the plaintiff and that the plaintiff's claims are barred by applicable statutes of limitations. In partial amplification of the issues thus joined by the pleadings, but without direct significance in determining the narrow question presented by this appeal, it may be noted that in the oral arguments of counsel in this court, it was made to appear, without any apparent contention to the contrary, that plaintiff did not request payment in accordance with the rates set forth in Motor Vehicle Tariff No. 3, as amended, at the times defendant paid for the transportation services, but rather was content at the times of the shipments to receive the amounts actually paid by defendant.

The following disposition of this action in the district court leads to this appeal. After the filing of the complaint, plaintiff served upon defendant and filed written interrogatories under Rule 33, Federal Rules of Civil Procedure, 28 U.S.C.A. Defendant thereafter served and filed objections to interrogatories and plaintiff subsequently served and filed a motion for an order overruling defendant's objections to interrogatories. At the time set for hearing on those several motions, defendant contended that the Nebraska State Railway Commission was required by Section 84–901 et seq., R.S. Neb.1943, Cum.Supp.1949, Reissue of 1950, to file the regulations and rates promulgated and published by it in Motor Vehicle Tariff No. 3, as amended, with the Secretary of State; and that, in default of such filing, the rates purportedly established in and by Motor Vehicle Tariff No. 3, as amended, were void and of no force, thereby necessitating the dismissal of plaintiff's complaint. Upon defendant's request, the district court postponed ruling upon the interrogatories, objections and motion then pending in order to determine, first, the applicability of Sections 84–901 to 84–906, R. S.Neb.1943, Cum.Supp.1949, Reissue of 1950, to the allegations of plaintiff's complaint and, particularly, to those portions of the complaint relating to the rates promulgated by the Nebraska State Railway Commission. The question was submitted to the district court upon argument and briefs. That court, in a memorandum opinion,

Mogis v. Lyman-Richey Sand & Gravel Corporation, D.C.Neb., 90 F.Supp. 251 and accompanying order, found that rate tariffs prescribed by the Commission were to be included within the meaning of "rules" as that term appears and is defined in Sections 84–901 to 84–906, R.S.Neb.1943, Cum. Supp.1949, Reissue of 1950, and that the failure of the Nebraska State Railway Commission to file the rate tariffs set forth in Motor Vehicle Tariff No. 3, as amended, with the Secretary of State of Nebraska rendered the rate tariffs invalid, and dismissed the complaint of plaintiff.

 It is from the determination of this single question adversely to the plaintiff that this appeal is taken. Although the agreed statement of the case preserves for the plaintiff other possible bases for appeal, only the question just stated has been urged by counsel on behalf of the plaintiff, either in briefs or upon oral argument, and all others will be considered to have been abandoned for the purposes of this appeal. General Finance Loan Co. v. General Loan Co., 8 Cir., 163 F.2d 709.

Without unnecessary quotation, Sections 84–901 to 84–906, R.S.Neb.1943, Cum.Supp. 1949, Reissue of 1950, enacted in 1945, amended without presently material change in 1947, in effect at the times of all shipments in suit, provided, generally, that each agency, theretofore defined as "each board, commission, department, officer, division or other administrative office or unit of the state government authorized by law to make rules, except the courts and the Legislature", shall file in the office of the Secretary of State a certified copy of the rules of the agency in force when the Act was passed and any rule subsequently adopted by the agency. The agency is required to publish its rules in such a manner as will best bring the existence and scope of the rules to the attention of persons affected thereby. Provision is also made for the filing by the agency before each regular legislative session of a complete certified compilation of all rules then in force and effect, which shall supersede all rules previously filed. A certified copy of each rule is to be submitted to the Attorney General whose approval or disapproval of the rule shall be attached to the filing. And, finally, it is provided that "no rule required under this act to be filed with the Secretary of State, shall be valid as against any person until the certified copy of the rule shall have been so filed".

The statute in question was originally enacted as Chapter 255 of the Laws of Nebraska for 1945. It was completely rewritten and as amended reenacted as Chapter 350 of the Laws of Nebraska for 1947. But, except for a provision, now reflected in Section 84–905 R.S.Neb.1943, Reissue of 1950, imposing upon the Attorney General certain advisory duties respecting the legality of agency rules (vide infra), the amendments involved no essential change in the statute. Its amended form, from which all citations herein are made, is somewhat more detailed in its language than was the original text of the Act.

In a stipulation which is a part of the statement of the case, the parties have agreed that Official Motor Vehicle Tariff No. 3 issued by the Nebraska State Railway Commission and applicable amendments thereto were not filed with the Secretary of State of Nebraska. Neither the entire tariff nor any of the specific parts having application to the parties hereto was filed as provided in Sections 84–901 to 84–906, R. S.Neb.1943, Cum.Supp.1949, Reissue of 1950. Thus, if Official Motor Vehicle Tariff No. 3, as amended, issued by the Nebraska State Railway Commission, ostensibly operative during the interval of time involved in the pleaded undercharges was included within the scope and meaning of Sections 84–901 to 84–906, R.S.Neb. 1943, Cum.Supp.1949, Reissue of 1950, then that tariff, in order to be binding upon defendant and thereby to constitute a valid basis for this action by plaintiff, must have been filed with the Secretary of State; and, since it was not so filed, plaintiff's action is without foundation and the district court's dismissal of plaintiff's complaint must be affirmed. But if rate tariffs as adopted and amended by the commission were not properly within the scope of the Act, then the fact that the tariff now involved was not filed with the Secretary of State would not affect plaintiff's cause

of action, and we would be required to reverse the contrary determination of the trial court.

■ The task before the district court was the determination of the reach and meaning of a statute of the state within which that court is held. Our inquiry in this appeal is whether that determination was erroneously made. In that study an important consideration is the settled, though rationally and flexibly administered, rule that the reasoned opinion of a trial court upon the status of the law of the local state within which it acts should be accorded great weight by this court, and should not be overturned unless the appellate court is clearly convinced that it is erroneous. That rule applies especially on occasions when, in default of authoritative state legislative enactment or judicial ruling, the trial court declares its appraisal of the probable course of the state's highest court in the event of the submission to it of the controverted legal issue. John Hancock Mutual Life Ins. Co. of Boston, Mass. v. Munn, 8 Cir., 188 F.2d 1; Western Casualty & Surety Co. v. Coleman, 8 Cir., 186 F.2d 40, 43; Magill v. Travelers Ins. Co., 8 Cir., 133 F.2d 709, 713; Doering v. Buechler, 8 Cir., 146 F.2d 784, 788; Railway Mail Ass'n v. Chamberlin, 8 Cir., 148 F.2d 206, 208; Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Roth v. Swanson, 8 Cir., 145 F.2d 262, 266; Mattson v. Central Electric & Gas Co., 8 Cir., 174 F.2d 215, 221; Anderson v. Sanderson & Porter, 8 Cir., 146 F.2d 58, 62; Yoder v. Nu-Enamel Corp., 8 Cir., 145 F.2d 420, 423, 425.

In Magill v. Travelers Ins. Co., supra, after adverting to a doubtful question of Missouri law involved in the case and an allowable conclusion concerning it, this court said: "The trial court, in the case at bar, believed that to be the law. In deciding what the highest court of a state would probably hold the state law to be, great weight may properly be accorded by this court to the view of the trial court. * * * This court would be justified in adopting a contrary view only if convinced of error." [133 F.2d 713.]

The opinion in Russell v. Turner, supra, reiterated that rule, and proceeded thus to explain "conviction of error" in that context: "This does not mean that an appellant, in order to obtain a reversal of a judgment in a case such as this, must demonstrate error to a mathematical certainty, but it does mean that this court will not overrule a decison of a trial judge upon a question of state law except for cogent and convincing reasons. * * * All that this court reasonably can be expected to do in reviewing cases governed by state law is to see that the determination of the trial court is not induced by a clear misconception or misapplication of the law." [148 F.2d 564.]

A like position is sanctioned by many opinions of the Supreme Court, among which may be mentioned Reitz v. Mealey, 314 U.S. 33, 39, 62 S.Ct. 24, 86 L.Ed. 21; MacGregor v. State Mutual Life Assur. Company, 315 U.S. 280, 281, 62 S.Ct. 607, 86 L.Ed. 846; and Helvering v. Stuart, 317 U.S. 154, 164, 63 S.Ct. 140, 87 L.Ed. 154. In MacGregor v. State Mutual Company, supra, that court said: "No decision of the Supreme Court of Michigan, or of any other court of that State, construing the relevant Michigan law has been brought to our attention. In the absence of such guidance, we shall leave undisturbed the interpretation placed upon purely local law by a Michigan federal judge of long experience and by three circuit judges whose circuit includes Michigan." [315 U.S. 281, 62 S. Ct. 607.]

It is not suggested that any ruling by the Supreme Court, or any other court, of Nebraska has construed or applied the statute in controversy in a manner at variance with the decision of the trial court in the present action, or otherwise. It has not undergone any other judicial examination or application. In determining whether we are "convinced of error" on the part of the district judge, we are, therefore, remitted to the language of the statute under scrutiny, to the few earlier possibly relevant constitutional and statutory provisions respecting Nebraska State Railway Commission, to such decisions from other states as seem to us to have any present significance,

to the legislative history of the statute, and finally to its very recent amendment by the current session of the state's legislature, considered both independently and as a part of the history of the legislative treatment of the subject before us.

In brief summary, the essential provisions of the statute, before its amendment last suggested, have already been mentioned, and certain of its critical language has been reflected verbatim. That the State Railway Commission is an "agency" within its reach is admitted. Its requirement for the filing with the Secretary of State of a certified copy of the "rules in force and effect" of each affected agency, as well as of "rules" thereafter adopted by the agency is to be understood in the light of its own definition of "rule" contained in the first section of the act, now Section 84–901 R.S.Neb.1943, Reissue of 1950. That definition follows: " * * * 'rule' means the written statement of any rule, regulation, standard or policy of general application issued by an agency, including the amendment or repeal thereof, and designed to implement, interpret or make specific the law enforced or administered by it, or governing its organization or procedure, but not including regulations concerning the internal management of the agency not affecting private rights or interests; Provided, that for the purpose of this act every rule which shall prescribe a penalty shall be presumed to have general applicability or to affect private rights and interests."

Thus defined and amplified, the term "rule" is sufficiently broad to include "rates". A "rate" or "rate tariff" may well be regarded as a "regulation". It is through its regulatory function that a state railway commission controls and prescribes rates. A rate tariff, moreover, is not always or necessarily a mere compilation of destinations and applicable transportation figures. Not invariably, but frequently, it is accompanied by the prescription of rules for its construction or interpretation. (See discussion, infra, respecting attempted and eventually effected amendments of the instant statute). The Commission's Official Motor Vehicle Tariff No. 3, as amended, has "general application". It "affects private rights and interests" and not merely the "internal management of the agency". And a rate prescription may reasonably be thought "to implement, interpret and make specific the law" concerning the regulation of common carriers which is administered by the Commission. The immediately foregoing reflections allow, and in substantial measure support, the inference that rate tariffs are included within the statutory term "rules". Admittedly, they are not conclusive upon the point, although they are considerations whose tendency is surely in support of the district Court's conclusion.

Considerations to the contrary issuing from the language and provisions of the statute itself are its provisions that each agency shall publish its rules in such manner as it shall determine with a view to their direction to the attention of affected persons, Section 84–903; for the filing by each agency with the Clerk of the Legislature within a period specified before the commencement of each session of the Legislature of a certified, and properly indexed copy of all of its rules then in force with the declared purpose of consideration by the legislature, Section 84–904; for the agency's compilation and printing or other multiplication of copies of its rules in effect at a designated interval before each session of the Legislature and the public circulation of such copies at a cost price, or, if funds are available, without charge, Section 84–905; and, by amendment in 1947, for the submission seasonably before each legislative session of each amendment or rule adopted under the act to the Attorney General, who is thereupon charged with the duty of examining each such rule and signifying to the Secretary of State his approval or disapproval of the rule and of making examination of the rule file of each agency in the office of the Secretary of State thirty days prior to the next regular legislative session (evidently meaning the 1949 biennial session) and approving such file or reporting to the legislature upon each rule which in his opinion fails to meet constitutional and statutory requirements, Section 84–905. It may be, and is, argued that such requirements are much more clearly

and easily complied with in relation to such matters as rules of practice and procedure than in connection with voluminous ·rate tariffs. But that consideration has principally to do with the practicality and desirability of imposing such requirements in respect of rate tariffs rather than with the question whether the legislature did actually impose them, although it is quite true that reasonable practicality is a factor entitled to consideration in arriving at a conclusion respecting the meaning of a doubtful statute.

Plaintiff argues that rate tariffs should be excluded from the mandate of Section 84-902 R.S.Neb.1943, Reissue of 1950, because of the constitutional erection and powers of the Railway Commission and the earlier statutory prescriptions dealing with its regulation of intrastate motor carrier rates. The constitutional provision for the Commission was made in 1906. Article IV, Sec. 20, Constitution of Nebraska. Of the amendment, only the concluding sentences need be noted: "The powers and duties of such commission shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision."

Within the meaning of that constitutional language, specific legislation comprehensive in scope has been enacted within whose framework the commission regulates motor carriers. Sections 65–222 to 250, inclusive, R.S.Neb.1943, Reissue of 1950. Certain, though not all, of the sections dealing with rates, inclusive of their headnotes suggestive of subject matter, follow:

"75–241. Motor common carriers; rates; commission shall prescribe. The State Railway Commission is vested with power and authority to, and it shall be its duty to make investigations, hold hearings, and prescribe reasonable rates and charges for the transportation of passengers and property by common carrier, which rates and charges shall become effective not later than sixty days after such prescription."

"75–244. Motor common carriers; tariffs; publication. After having been re-quired to publish tariffs showing rates, fares and charges for the transportation of passengers or property, it shall be unlawful for any motor carrier to engage in the transportation of passengers or property unless the rates, fares and charges upon which the same are transported by said carrier have been published in accordance with the provisions of section 75–247."

"75–245. Contract motor carriers; rates; commission shall fix. The State Railway Commission is vested with power and authority, and it is hereby made its duty, to prescribe minimum rates, fares and charges for contract carriers. The minimum rates, fares and charges prescribed shall become effective simultaneously with the rates prescribed by the commission for common carriers."

"75–247. Contract motor carriers; rates; publication. It shall be the duty of every contract carrier by motor vehicle to file with the State Railway Commission, publish and keep open for public inspection, in the form and manner prescribed by the commission, schedules containing the minimum charges of such carrier or carriers for the transportation of passengers or property in intrastate commerce, and any rule, regulation or practice affecting such charges and the value of the service thereunder: No such contract carrier, unless otherwise provided by section 75–222 to 75–250, shall engage in the transportation of passengers or property in intrastate commerce unless the minimum charges for such transportation by such carrier have been published, filed and posted in accordance with the provisions of this section; Provided, however, that no rules of the commission issued pursuant to the provisions of this section shall prevent a group of such carriers from publishing such rates, fares or charges collectively or by their agent."

The plaintiff's contention seems to be that a construction of Sections 84–901 and 902 should be adopted which would eliminate the filing of rates and tariffs from their scope, because, otherwise they would erect a new, or at least an additional, method of the publication of rates and tariffs and thereby effect an amendment by implication of the cited earlier sections, notably

Section 75–244. We realize that the point thus made in relation to the tariffs of motor carriers has similar significance in relation to the other fields of the Commission's rate regulatory authority, including especially the passenger and freight rates of railroads.

However, the argument is not persuasive. An amendment requiring further publication may indeed be conceded to have resulted from the enactment of Sections 84–901 et seq. But its invalidity need not be granted because of the failure of the Act of 1945 or the amendatory Act of 1947 to single out and, both in their titles and in their provisions, to designate by number the sections of the statute thus supplemented, and thereby modified. The Acts of 1945 and 1947 were complete in themselves and therefore adequate without numerical designation and specific amendment or repeal to supersede, supplement or modify earlier acts or parts of acts in conflict with them. Chicago & N. W. Ry Co. v. County Board of Dodge County, 148 Neb. 648, 28 N.W.2d 396; Consumers Public Power District v. Eldred, 146 Neb. 926, 22 N.W.2d 188; State ex rel. Thayer v. School District of Nebraska City, 99 Neb. 338, 156 N.W. 641; State ex rel. Farmers' State Bank of Pickrell v. Hevelone, 92 Neb. 748, 139 N.W. 636; State ex rel. Farmers Mutual Ins. Co. of Nebraska v. Moore, 48 Neb. 870, 67 N.W. 876; State v. Page, 12 Neb. 386, 11 N.W. 495.

Reported opinions dealing with the significance of the terms "rules" and "regulations" of jurisdictions other than Nebraska may be examined in estimation of the probable course of that state's courts. They are few and not completely conclusive. Yet, they tend to support in some measure the view arrived at by the district court in this action.

"Regulation", by the definition of the statute under examination, is included within the significance of "rule". In, Ames v. Union Pacific Ry. Co., C.C., 64 F. 165, 178, this court recognized that the term "regulation" was susceptible of more than one meaning. Adverting, first, to one such meaning, it said: "But within the scope of the word 'regulation', as commonly used,

is embraced the idea of fixing the compensation which the owners of railroad property shall receive for the use thereof".

Citing the Ames opinion, the Supreme Court in Boston & Maine Railroad v. Hooker, 233 U.S. 97, 115, 116, 34 S.Ct. 526, 530, 58 L.Ed. 868, declared:

"* * * The question then is, did the limitation as to liability for baggage, based upon the requirement to declare its value when more than $100 was to be recovered, come within that provision?

"It seems to us that the ordinary signification of the terms used in the act would cover such requirements as are here made for the amount of recovery for baggage lost by the carrier. *It is a regulation which fixes and determines the amount to be charged for the carriage* in view of the responsibility assumed, and it also affects the value of the service rendered to the passenger. *Such requirements are spoken of, in decisions dealing with them, as regulations; * * *.*" (Emphasis added.)

Two opinions of the Supreme Court of Georgia point to the inclusion of rates and tariffs within the definition of "rules" or "regulations". From Parmelee v. Savannah, F. & W. Ry. Co., 78 Ga. 239, 2 S.E. 686, 687 is taken the following comment: "We are of the opinion that the amendment sought to be made in this case was a different cause of action from that set forth in the original declaration, because by the act of 1878 (Code, § 719j) it is provided: 'If any railroad company doing business in this state shall, *in violation of any rule or regulation* provided by the commissioners aforesaid, inflict any wrong or injury on any person, such person shall have a right of action, and recovery for such wrong or injury, in the county where the same was done, in any court having jurisdiction thereof: * * * provided, that all suits under this article shall be brought within twelve months after the commission of the alleged wrong or injury.' The proviso to this act is a condition precedent, upon which the suit must be brought. The right of action is given, provided the same is brought within 12 months from the time the same accrued. If the same be not brought with-

in 12 months, then there is no right of action under this statute; and where a case has been brought within 12 months, and dismissed, and another case brought, but not within 12 months from the time the right of action accrued, no such right exists; and the statute which provides for the bringing of actions after the dismissal of the same, within 6 months, does not apply in a case like this. *The establishment of freight rates by the railroad commission is a rule or regulation within the meaning of the act.*" (Emphasis added.)

And from Atlantic Log & Export Co. v. Central of Georgia Ry. Co., 171 Ga. 175, 155 S.E. 525, 527, these sentences: "The Civil Code (1910) § 2640, provides for liability of a railroad company for damages produced by 'violation of any rule or regulation' made by the railroad commissioners. *Rates and tariffs 'fixed by' the board of railroad commissioners come within the meaning of the words 'rule or regulation' above mentioned.* Parmelee v. Savannah, Florida & Western Railway, 78 Ga. 239, 2 S.E. 686. A charge for freight in excess of the rates and tariff fixed by the commission is such violation of the rules of the commission as will give a statutory right of action under that section of the Code. This applies also to rules and regulations of the Georgia Public Service Commission, that body being the successor to the former board of railroad commissioners of Georgia, and having in virtue of the act of 1922 (Ga.Laws 1922, p. 143) succeeded to all its powers and duties. Estes v. Perry [167 Ga. 902, 147 S.E. 370], supra. The rates and tariffs which a railroad company may charge are no longer the subject of contract between such companies and their patrons, but are fixed by the rules and regulations of the commissioners, and the statute gives the right of action against the companies for charging intrastate freight rates in excess of those fixed by the commission." (Emphasis added.)

One must conclude that, so far as the reported opinions extend, the trial judge's determination that "rates" are within the statutory definition of "rules" is not intrinsically unreasonable or without the support of precedent.

Both parties profess to find fortification for their conflicting positions in what they advance as the legislative history of Section 84–901 et seq. R.S.Neb.1943, Reissue of 1950. Plaintiff is especially insistent upon its significance. The persuasiveness, in appropriate circumstances, of authentic legislative history, upon legislative intent and meaning in the enactment of a measure whose language is obscure and uncertain must be acknowledged. Resort ought not to be had to that rule, however, to explain and by explaining to confuse, the obvious, or to import obscurity into an area which before its intrusion is unclouded. But granting for the purposes of consideration, though not declaring, the presence of some uncertainty of meaning in the Act, we are of the opinion that the legislative history advanced for its resolution does not discredit the trial court's ruling.

Upon the hypothesis that an important consideration in the understanding of the significance of a corrective legislative act is the mischief it was meant to mend, plaintiff first and principally cites, and, at length, quotes and discusses a report of the Nebraska Bar Association's 1943 special committee on administrative agencies and tribunals. 22 Nebraska Law Review, No. 4, pp. 29–39. That report is advanced as the inspiration for the filing statute. In the report, the committee stated that it was concerned with "the *forms in which these agencies act,* and the means by which a review may be had of their acts." The report then declared the purpose of the committee to distinguish *substantive rules* promulgated by agencies from *"mere rules of procedure and practice,"* and to deal with the former and not the latter. The committee specifically cited the authority of the Nebraska State Railway Commission in the absence of legislation to regulate the rates and services of common carriers as "perhaps the most striking illustration of substantive rule-making in Nebraska." Thereby the committee classified rate and service regulation as "substantive rule-making". The report recognized the commission's custom to refer to action taken in this behalf as "general orders". The

principal observation and recommendation of the committee was then set forth:

" * * * The committee wishes to call attention to what it regards as an unsatisfactory situation in this respect. There seems to be no practicable source from which a lawyer could learn what *general orders or regulations* of the Railway Commission are now in force. Indeed, its rules of practice seem to be available only by consulting a typewritten copy at the Commission's office. It seems clear that regulations of continuing force having the same effect as a legislative enactment should be published and accessible to attorneys and others interested.

"We express our belief in the desirability of a requirement for filing regulations in some designated registry, such as the Office of the Secretary of State, and otherwise making them publicly available."

Extended analysis of the report may not be offered here. It is very long and much of it is unrelated to the present subject. However, it sufficiently appears from the foregoing references that the committee was thinking specifically of rates prescribed by the Commission in recommending provisions for the filing of "general orders or regulations". We do not consider that the inference just suggested is repelled by plaintiff's argument, already mentioned in another relation, resting on the constitutional origin of, and grant of power to, the Commission and the allegedly adequate legislative prescriptions respecting its regulation of motor carriers and their rates and the manner thereof.

Nothing significant respecting the meaning of the term "rule" in the present setting occurred during the progress to passage and approval of the 1945 Act which was L.B. 138 of that legislative session. Nor, as we are convinced, is subsequent action of the same legislature in reference to it, of any significance. L.B. 138 was passed by the legislature on February 28, 1945 and approved by the Governor on March 3, 1945. Thereafter, on April 18, 1945, the legislative session being still in progress but the time for the individual introduction of bills having expired, the Committee on Judiciary introduced L.B. 388 as a proposed amendment of the first two sections of the earlier bill dealing with definitions. As introduced, the measure would have excepted "rate tariffs, together with rules of interpretation thereof" from the requirements of L.B. 138. The legislature, however, amended L.B. 388 in such manner as wholly to except the State Railway Commission from the requirements of L.B. 138, and as thus amended, passed the amendatory bill on May 9, 1945. But on May 12, 1945, after the legislature's adjournment, the Governor vetoed L.B. 388.

We can perceive in the course of L.B. 388 just recalled no implication requiring us to reject the trial court's opinion of the meaning of L.B. 138. Quite the contrary, it may well be concluded from the abortive attempt at amendment, that the legislature after passing L.B. 138 concluded that it had a consequence which upon further reflection was considered unwise. And, its attempted elimination having failed, the consequence persisted.

■ Not strictly or entirely as a part of the legislative history of the 1945 Act but, first, as an independent factor, plaintiff cites an opinion of the Attorney General of Nebraska dated July 16, 1945 in which that official offers the conclusion that the Commission's rate tariffs are not within the filing requirements of Section 84–902 or the definitions of Section 84–901. The opinion was delivered in the performance of one of the duties of the Attorney General in response to a formal request by the Commission, which, incidentally, disclosed the Commission's tentative view of the law to be that which the writer of the opinion confirmed. The opinion is long and covers many details. But of special present interest is its conclusion respecting "tariff schedules" that "we do not believe that they come within the definition as used in the act". That view is expressed in a sentence whose opening clause is "While in a sense such tariff schedules might be said to be rules of general application". Even perceiving in the opinion a measure of intrinsic certainty and assurance which it does not possess, standing alone *it is not*

to be regarded as a legal precedent or authority of such character as a judicial decision. It is entitled to substantial weight and respectful consideration, but it has no controlling authority upon the state of the law discussed in it. Follmer v. State, 94 Neb. 217, 142 N.W. 908. While the district court in its ruling under examination expressly disagreed with the Attorney General's opinion, it did not ignore or fail to consider it.

The opinion just mentioned is also and secondly pressed upon us by the plaintiff in another, and less independent relation. He reminds us that after requesting and obtaining the opinion, the Railway Commission acted upon it and refrained from filing with the Secretary of State any of its rate schedules or tariffs within its diversified regulatory area, including those involving motor carriers; that in 1947 the legislature amended and revised the filing act of 1945, without however altering its definitions or filing requirements; and that in 1949 that body held its biennial session without taking any action in reference to the filing act. And he argues that the amendment of 1947 and the legislative inaction of 1949, considered separately or in combination against the background of the Attorney General's opinion and the failure of the Commission in reliance on that opinion to file its rates or tariffs, should be considered adequately and decisively to confirm the validity of the position taken by the Attorney General and the Commission upon the meaning of the Act of 1945.

■ The significance and force of that argument have not been overlooked or disregarded by this court. In Nebraska the reenactment without essential change of a statute which has undergone *judicial* construction is an adoption of the construction unless the contrary appears. State ex rel. Pearson v. Cornell, 54 Neb. 647, 75 N.W. 25; Kendall v. Garneau, 55 Neb. 403, 75 N.W. 852; Shandy v. City of Omaha, 127 Neb. 406, 255 N.W. 477. The reasoning in support of that statement led the state's supreme court in State ex rel. Patte County v. Sheldon, 79 Neb. 455, 113 N.W. 208, to affirm the existence of, and to follow, *a presumption* of legislative adoption

of *administrative construction* and application in reference to a statute which had been in force and received consistent and identical practical administrative construction through nearly forty years within which period it had been reenacted without essential verbal change on several occasions. A like rule obtains in the national courts in relation to federal legislation National Lead Co. v. United States, 252 U.S. 140, 40 S.Ct. 237, 64 L.Ed. 496; Allen v. Morsman, 8 Cir., 46 F.2d 891; Fishgold v. Sullivan Drydock & Repair Corporation, 2 Cir., 154 F.2d 785, affirmed 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230. But the case last cited, both in the court of appeals and in the supreme court emphasizes the presumptive character of the rule as a canon of statutory construction, and its lack of decisive finality in all circumstances.

■ Administrative construction of a statute by the highest officer of an executive department charged with its enforcement, especially if it has long been adhered to, is also entitled in Nebraska to great weight in the judicial appraisal of the statute's meaning, Rohrer v. Hastings Brewing Co., 83 Neb. 111, 119 N.W. 27; Douglas County v. Vinsonhaler, 82 Neb. 810, 118 N.W. 1058. And this is especially true in instances where such construction has been left undisturbed through several successive legislative sessions, State ex rel. Village of Dakota City v. Bryan, 112 Neb. 692, 200 N.W. 870; Elmen v. State Board of Equalization and Assessment, 120 Neb. 141, 231 N.W. 772; Chicago & N. W. R. Co. v. Bauman, 132 Neb. 67, 77, 271 N.W. 256, 261. The writer of the last cited opinion summarized the actual Nebraska rule in this manner: "It seems we are committed to the view that the construction of statutory provisions of doubtful meaning given them by those whose duty it was to enforce them, and which construction the legislature has by its continued noninterference for a number of years acquiesced in, will be approved, unless as thus construed they contravene some provision of the Constitution, or are clearly wrong."

That, we conceive more exactly to reflect the position of the Nebraska supreme

court upon the issue than our own more positive and less guarded language in Massachusetts Mutual Life Insurance Co. v. George & Co., 8 Cir., 148 F.2d 42.

Admonished by Nebraska's direction, we have given due consideration, in the light of the Attorney General's opinion and the course of the Railway Commission, to the silence of the amendatory act of 1947 touching the definitions of the 1945 Act and to the complete inaction in the matter of the legislature in its 1949 session. Whether only two sessions of the legislature without corrective amendment should be considered adequate to raise the inference of legislative acquiescence in the Commission's course and the Attorney General's opinion may be arguable, but we might answer the inquiry affirmatively if that constituted the entire legislative attention or inattention to the subject. But it does not.

For, finally, the legislature did act. In its 1951 session an amendatory bill was introduced which, in its tendered form, would have modified Section 84–901 in such manner as to remove the State Railway Commission altogether from the definition of "agency" and, therefore, from the operation of the filing Act. But the standing committee dealing with the bill, recalling the executive veto in 1945 of a measure identical with that originally proposed, supra, amended it by striking from it entirely the proposed modification of the definition of "agency", thereby leaving the Commission generally within the scope of the filing Act, and by excluding from the definition of "rules", "rate tariffs, together with rules of interpretation thereof". Thus amended, the bill was passed without an emergency clause by the legislature on April 5, 1951 and was promptly approved by the Governor, both the passage and approval of the measure occurring after the final submission of the appeal to this court upon oral argument. So, for the future, and effective as of the operative date of all enactments without emergency clauses by the 1951 general session of the state's legislature, rate tariffs will be eliminated from the filing requirements of Section 84–902.

█ That action of the 1951 session of the legislature may properly be considered to support the trial court's opinion that before it was taken, and especially during the period embracing the shipments in suit, rate tariffs were within the reach of the filing Act.

█ As a general principle of statutory construction, it will be presumed that the legislature, in adopting an amendment of a statute, intended to make some change in existing law. United States v. Bashaw, 152 U.S. 436, 14 S.Ct. 638, 38 L.Ed. 505; Essex Storage Electric Co. v. Victory Lumber Co., 95 Vt. 117, 112 A. 832; People v. City, Etc. of Denver, 84 Colo. 576, 272 P. 629; State ex rel. Maryland Casualty Co. v. District Court, 134 Minn. 131, 158 N.W. 798. Nebraska's court seems not to have made an explicit declaration upon this exact question, but there appears to be no reason to suppose that it would not adhere to the prevailing rule upon it. See Union Pacific Railroad Co. v. Heuer, 97 Neb. 436, 150 N.W. 259, and State ex rel. Davis v. Farmers State Bank, 112 Neb. 597, 601, 200 N.W. 173, 175. In the case last cited, the court said, concerning the significance of an amendatory statute enacted after the occurrence of the facts then in suit and imposing a penalty as a sanction for acts theretofore statutorily declared unlawful without the provision of any penalty: "Of course, it goes without saying that the 1923 amendment can have no direct application to the facts before us. But it shows that the legislature was evidently of the opinion that the act, as it formerly stood, did not provide a penalty for its violation, hence an amendment was added which, * * * now, in specifically drastic terms, provides a penalty. So that, by the subsequent amendment, we have the legislative view that section 8005, Comp.St.1922, prior to the amendment, did not contemplate the penalty of forfeiture for which the receiver contends. Otherwise, it seems that the act would not have been amended."

That language reflects an attitude of conformity to the general judicial position upon the subject. And it provides substantial warrant for our own attention to the action upon the issue before us of the 1951 session of Nebraska's legislature.

In appraising amendatory legislation we must also observe the rule that unless the contrary appears and is constitutionally permissible, it must be given only prospective effect and not be allowed to operate retrospectively. War Finance Corporation v. Thornton, 118 Neb. 797, 226 N.W. 454; School District of Omaha v. Adams, 151 Neb. 741, 39 N.W.2d 550; and, in applying Nebraska law, Massachusetts Mutual Life Ins. Co. v. George & Co., supra.

Nothing in the language of the 1951 amendment suggests either that it should be applied retrospectively or that it is merely interpretative or constructional of existing law and not truly amendatory. On the contrary, its meagre legislative history suggests quite clearly that it should be accorded only future operation and was designed actually to modify the existing law. That history is reflected in a brief report upon the bill by the standing committee to which it was referred, speaking through its chairman. After declaring that the committee "can see no reason why the Railway Commission tariffs together with rules for their interpretation should be filed with the Secretary of State", the report adds that "the committee is informed that the Railway Commission has not conformed with this *requirement*." (Emphasis added.) The inference is clearly allowable, if not necessary, that by the use of the term "requirement" the committee assumed or declared the antecedent existence of such a prescription. That view is supported by the committee's further declaration that "the committee at its executive meeting on March 7 amended the bill so that it will no longer require the filing of the tariff, but will still require the Railway Commission to file all other information with the Secretary of State." The words "no longer" and "still" seem reasonably to emphasize the impression of the then effective existence of a requirement for the filing of rate tariffs.

The observations we have offered upon the amendatory Act of 1951 are directed chiefly to its consequence as an isolated legislative action. However, since the attitude of the legislature of the state in its several sessions subsequent to 1945 has been drawn in issue—and we consider properly—the thought is again offered that the Act of 1951 and its history are a part, and in a sense, the only positive and decisive part, of the record of that attitude, and we have so regarded it.

In the foregoing examination we have undertaken to give adequate attention to all of the considerations drawn by counsel to our notice, as persuasive or significant upon the single legal question addressed to the district court and on appeal presented to us for review. It is appropriate in summary to recall that the question is the state of Nebraska's law between September 15, 1945 and April 5, 1949 upon the inclusion within the statutory definition of the term "rules", of motor carrier rate tariffs prescribed by the Railway Commission under its regulatory authority. The answer to that question was initially given by the district court. Our function on appeal involves our careful examination of the problem not exactly for its independent solution, unrelated to that earlier answer, but rather to determine whether we are convinced of error in the trial court's deliverance upon it.

In the study of the district court, all of the material examined by us was available, with the exception of the action of the 1951 session of the legislature. Occurring so recently, that has been put within our reach, and is considered both as independently confirmatory of the trial court's ruling, and in association with earlier legislative action and inaction, (supra), as tending to nullify, or at least to minimize, the persuasive significance of the latter as against the trial court's position.

Appraised in their aggregate effect, the conflicting considerations examined lead us to the conclusion that the district court's opinion respecting the meaning of the Nebraska law applicable during the interval involved represents an allowable and reasonable, although admittedly not the inevitable, view supported by authority and by accepted principles of statutory construction. More directly to the point, we are not convinced that the trial court was in error in its ruling.

Accordingly, the judgment of the district court should be and is

Affirmed.

COLLET, Circuit Judge, (dissenting).

In 1945 the Nebraska Legislature passed an Act which provides that all state agencies shall file with the Secretary of State a certified copy of the "rules" in force and effect in such agencies and if not so filed such "rules" should not be valid.[1] The sole question for determination on this appeal is whether this Act, which will be referred to as the "filing Act", required the Nebraska Railway Commission to file all rate schedules of all public utilities subject to its supervision with the Secretary of State as a condition precedent to their validity. The present action is for the recovery of motor carrier rates approved by and filed with the Commission but not filed with the Secretary of State. The trial court held the rates sought to be collected were invalid because not filed with the Secretary of State. This appeal is from that ruling. Consideration of the legislative history of the filing section is concededly appropriate.

The Railway Commission was created by constitutional enactment in 1906. By the Constitution the Commission was given the power and duty to regulate rates of public utilities in the state. The Constitution also gave to the legislature the authority to direct the Commission in the discharge of its duties and provided that if the legislature did not do so the Commission should exercise its duties in its own way. Pursuant to the authority given the legislature, that body many years ago provided that the public utilities, including motor carriers subject to the Commission's regulation, such as the plaintiff herein, should file their rate schedules with the Commission.[2] Unless they were so filed they were invalid. But when filed with the approval of the Commission and published, such rates were the legal rates and the only legal rates.

This procedure is a common one under State Regulatory Laws. It has been followed in Nebraska for many years and is without dispute the law in that state today. In 1945 the Nebraska State Bar Association became concerned with the unavailability of *"general orders or regulations"* of the Railway Commission and other state agencies. A committee of lawyers was appointed to investigate the situation and make a report and recommendations. This committee reported with respect to the Railway Commission that (as quoted in the majority opinion) there was no practicable source from which a lawyer could learn what general orders or regulations of the Railway Commission were in force,

1. Cum.Supp.Nebraska Statutes 1949, Sec. 84–901, et seq.

84–902: "Each agency shall file forthwith in the office of the Secretary of State a certified copy of the rules in force and effect in such agency on August 10, 1945. A certified copy of any rule adopted after August 10, 1945 shall likewise be so filed. * * *"

84–905.01: "* * * Thirty days prior to the next regular legislative session, the Attorney General shall have examined the file of each agency as it appears in the office of the Secretary of State, and shall approve same or file a report with the Clerk of the Legislature in the form of an opinion on each rule which in his opinion fails to meet the requirements of the Constitution and laws of the United States and the State of Nebraska."

84–906: "No rule required under this act to be filed with the Secretary of State shall be valid as against any person until the certified copy of the rule shall have been so filed; * * *."

84–901: "* * * (2) 'rule' means the written statement of any rule, regulation, standard or policy of general application issued by an agency, including the amendment or repeal thereof, and designed to implement, interpret or make specific the law enforced or administered by it, or governing its organization or procedure, but not including regulations concerning the internal management of the agency not affecting private rights or interests; *Provided*, that for the purpose of this act every rule which shall prescribe a penalty shall be presumed to have general applicability or to affect private rights and interests."

2. Secs. 75–241; 75–244; 75–245; 75–247; R.S.Nebr.1943 quoted in the majority opinion.

and that its rules of practice appeared to be available only by consulting a typewritten copy at the Commission's office. The report observed that "regulations of continuing force" had the same effect as legislative enactments and should be published and made accessible to attorneys and others interested. The committee recommended legislation requiring the filing of such "regulations" in some designated registry such as the office of the Secretary of State. Since this report and the recommendation made therein was the moving cause of the filing act subsequently passed, it should have considerable bearing upon the intent of that Act. The report was long and detailed. It was prepared by lawyers who went into the question covered meticulously. Nowhere in the entire report is the word "rate" or "rate schedule" even mentioned as within the purview of the recommended legislation. And the recommended legislation was to apply to *all* state agencies, only one of which had any cognizance of public utility rates or rate schedules. Did the instigators of the Act have "rate schedules" in mind? If they had, as good lawyers they would have said so.

The next step was the introduction of the bill which later became the filing Act. That bill contained no specific reference to "rates" or "rate schedules." It followed the Bar Association recommendation and applied to all state agencies. It provided that their "rules" be filed. In that form it was passed on February 28, 1945.[3] It appears that soon after its passage the question must have been raised as to whether the term "rules" as used and defined in the filing Act could be construed to include "rates" or "rate schedules" which the law required be filed with the Railway Commission. It is very probable that the legislative committee of the State Bar Association, good lawyers as they no doubt were, made assurances that this general Act of 1945, the filing Act, would not be construed as a repeal by implication of the old, old provision of their law providing for the filing of "rates" and "rate schedules" with the Railway Commission. But

fifteen days after the Governor's approval of the filing Act, a bill was introduced *by the Committee on Judiciary itself* to make sure that the filing Act would not be construed to include "rates" or "rate schedules". This bill specifically provided that "rate tariffs, together with rules of interpretation thereof" should be excepted from the provisions of the filing Act. This is the first time the words "rates" or "rate schedules" or "tariffs" can be found in the legislative history of the filing Act, and then it was in an effort to make certain that "rules" would not include them. This bill "to make more definite and certain" was amended to exempt the Railway Commission entirely from the provisions of the filing Act and as so amended was passed. Because in his opinion there was no good reason to exempt the Railway Commission from doing what all other state agencies were required by the filing Act to do, the Governor vetoed the amended bill. But the legislature had by then adjourned and the Railway Commission was confronted with the problem of following the demonstrated intent of the legislature that it did not intend to require the Commission to file "rates" with the Secretary of State, and not do so, and by such action take chances on being criticized for not filing "rates", and by such course of action also take chances that the validity of all of the "rates" of all kinds on file with it might be questioned as a result of the veto of the bill which would have settled the question beyond all question; or, by making copies of the truckload or more of rate schedules and filing them, to assume the repeal by implication of the long-recognized and time-honored statutory system of establishing rates in Nebraska by having them filed with the Commission. In the light of this situation and pursuant to statutory provision therefor, the Railway Commission called upon the Attorney General of Nebraska for his opinion as to whether "rates" or "rate schedules" were required by the filing Act to be filed with the Secretary of State. The Attorney General said, "No." The

3. The pertinent portions of which are heretofore quoted in the margin.

majority opinion raises some question concerning the positiveness of the Attorney General's conviction on the subject, but his language indicates a greater degree of conviction[4] than the language of the majority opinion expresses in its ultimate conclusion. Pursuant to the Attorney General's opinion, which the legislature had authorized, if not directed, the Railway Commission to obtain, and presumably to follow, the Commission filed none of the multitude of rates or tariffs or rate schedules filed with it by the public utilities of Nebraska. And it has filed none to this day. And apparently no one ever questioned the propriety of the Attorney General's opinion or the Commission's action until the question was raised for the first time in the Federal Court in this action. Two sessions of the Nebraska Legislature passed without complaint from or action by it. If the Commission's conduct had not been that intended by the legislature, all of the rates of all kinds being charged by all domestic utilities in Nebraska were unenforceable and invalid. And the Commission would have been defying the intent of the legislature. The legislature's non-action under those circumstances seems inconsistent with any theory other than concurrence in the universal construction then being given the filing Act. But when the Federal Court held in this case that all of the rates on file with the Railway Commission since the passage of the filing Act in 1945 were invalid because not filed with the Secretary of State, an entirely different situation, and a very serious

situation, arose. And the legislature met that situation by promptly reviving and passing the old "bill to make more definite and certain", specifically excluding "rate tariffs, together with rules of interpretation thereof," from the requirements of the filing Act of 1945. And the Governor, acting in complete consistency with the veto of 1945, promptly signed that bill into law.

The construction which the trial court gave the filing Act of 1945 can never be placed upon it again in the light of this recent action of the Nebraska Legislature. But as noted in the majority opinion, that legislative action is prospective in effect, not retroactive. It cannot, therefore, control the determination of this cause.

I agree that the ascertainment of the real intent of the legislature is our function in this case. I agree that in reaching that intent the legislative background of the filing Act should, under the circumstances of this case, be given consideration. I agree that the rule of "great deference" for the trial court's opinion on questions of local law is a good rule. But the limit of observance of the "great deference" rule should be the giving of great deference and respect to the trial judge's opinion on what the highest court of the state would do in construing a new statute, and if after doing so there still exists an abiding conviction on the part of the appellate court that the trial judge's conclusion is incorrect, the only proper course is to disagree with it. A good illustration of

4. "We must assume, however, that in passin L.B. 138 the Legislature did not intend to limit the powers vested in the Railway Commission by the constitution, or even those powers granted to it by the Legislature itself. For example, the constitution imposes on the Commission the duty to regulate rates of common carriers. The Legislature also has provided a procedure for establishing schedules and classifications of rates (85-302, R.S.1943) and required the common carriers to print and keep available for public inspection the schedules of rates and fares under which it operates (75-303, 75-304, R.S.1943). While in a sense such tariff schedules might be said to be rules of general application, we do not believe that they come within the definition as used in the act. Furthermore, there would appear to be nothing gained in the way of informing the public of these rates by filing copies with the Secretary of State in view of the statutory requirements that they be published by the carriers themselves; and it is inconceivable to us that the Legislature should intend that all such tariff regulations should be annulled and abrogated if not filed with the Secretary of State. We are of the opinion, therefore, that such tariff schedules and regulations are not included under L.B. 138."

both these principles is found in the recent case of Nelson v. Westland Oil Co. (Foster v. Westland Oil Co., Weston v. Westland Oil Co., and Myers v. Westland Oil Co.), 8 Cir., 181 F.2d 371, wherein this court disagreed with the District Judge of North Dakota concerning the construction to be given a North Dakota statute, and later the Supreme Court of North Dakota disagreed with this court. Those cases and the case before us furnish a further object lesson on the desirability of obtaining the judgment of the courts of the state on the proper construction of a state statute. Such a course would have been desirable in this case. And I think our opinion in this case should have been held in abeyance to permit that being done.

I agree that the administrative interpretation of the Act in question by the government agency affected is entitled to weight and consideration. And I believe that if any substantial weight is given to the administrative interpretation of the filing Act in this case the conclusion of the majority could not be sustained. I agree that the opinion of the Attorney General should be considered. But I believe it should be given more substantial consideration. I agree that the recent action of the legislature amending the filing Act of 1945 is significant—and that it changes things. But I do not believe it was intended to change anything except the construction the Federal Court put on the filing Act. And I believe that to be correct because the legislature did not act when the Commission construed the filing Act as not requiring the filing of "rates" with the Secretary of State. It did not act when the Attorney General so construed it. It did not act when if those constructions had been wrong tremendous property interests in Nebraska would have been jeopardized by the illegality of all rates. It acted only when and not until a Federal Court construed it otherwise and it was necessary for the legislature to do what it did to prevent a repetition of that construction. And I do not believe that the polite language of the committee's report referred to in the majority opinion to the effect that the committee was recommending the

passage of this amendment so that it would "no longer require" the filing of tariffs, means that the committee or the legislature construed the filing Act of 1945 as making that requirement. I would have been much surprised if the Nebraska Legislature or any committee thereof had said in a committee report of so eminent and distinguished a Nebraska jurist as the trial judge in this case, that "the Federal Court has misconstrued our statute and we are fixing it so that it cannot do so again". Hence, logic, diplomacy, statesmanship and good ethics on the part of the committee prompted it to use the language noted in the majority opinion and to go as far as it could go to undo the misconstruction of the filing Act by the trial court and prevent such misconstruction by this court by saying: "Moreover, the committee is informed that the Railway Commission had not conformed with this requirement, has not in the past filed their tariffs with the Secretary of State *and that there are suits now pending based on the premise that the tariffs are not legal, since they were not so filed."* (Italics ours.)

The committee certainly knew that the amendment it proposed could not determine this action or others like it. Hence the only possible reason for mentioning the existence of such case or cases as one of the reasons for the amendment was in the hope that the courts would construe the old law for the period of its past existence like they were saying it must be construed in the future. Indeed, that appears to be the only logical reason for the amendment of the filing Act.

I agree that rates may under many circumstances be treated as rules of a utility. I agree that the adjudicated cases on the subject are not of controlling value. The two Georgia cases referred to in the majority opinion—Parmelee v. Savannah F. & W. Ry. Co., 78 Ga. 239, 2 S.E. 686, and Atlantic Log & Export Co. v. Central of Georgia, 171 Ga. 175, 155 S.E. 525—are excellent illustrations of that fact. In each of those cases the court had before it the question of whether rules of a railroad filed with the state regulatory commission

should be construed to include the rates of the railroad. Certainly railroad "rates" constitute a part of and in most instances most of the rules of the railroad on file with the regulatory commission. But a factual situation like that is far different from one such as is involved here when we are seeking to determine whether utility "rates" were included in rules made by all state agencies and in which the bar generally was interested and concerned in the general practice of law. The rules contemplated by the filing Act of 1945 included the rules of state eleemosynary institutions, the rules of the boards, if any, controlling cosmetologists, osteopaths, the medical profession, the tax authorities, the prison authorities, and all other state agencies in Nebraska. Can it be said with logic that the legislature intended that the "rates", if any, promulgated by agencies such as those should be filed with the Secretary of State of Nebraska for the benefit, education, or guidance of the bar of Nebraska?

But most important of all, I cannot agree that the long-established law of Nebraska, specific, definite, and detailed in its application to rates, tariffs, and rate schedules, requiring that they be filed with the Railway Commission may be repealed by implication or superseded by a general act such as the filing Act of 1945. It is a cardinal rule of statutory construction that where a specific subject is dealt with by a statute dealing with that subject alone and with particularity, that a subsequent general act, not necessarily in conflict with the specific law, will not be held to have repealed the earlier law by implication. Repeals by implication are frowned upon, and it is only when it is necessary to give effect to the later general law that a repeal by implication is permitted.

In Kepner v. United States, 195 U.S. 100, loc. cit. 125, 24 S.Ct. 797, loc. cit. 803, 49 L.Ed. 114, the Supreme Court stated the rule as follows: "It is a well-settled principle of construction that specific terms covering the given subject-matter will prevail over general language of the same or another statute which might otherwise prove controlling."

The rule is reiterated in D. Ginsberg & Sons v. Popkin, 285 U.S. 204, loc. cit. 208, 52 S.Ct. 322, loc. cit. 323, 76 L.Ed. 704, as follows: "Specific terms prevail over the general in the same or another statute which otherwise might be controlling." Citing Kepner v. United States, supra.

This court said in United States v. Mammoth Oil Co., 8 Cir., 14 F.2d 705, loc. cit. 715: "In Washington v. Miller, 235 U.S. 422, 428, 35 S.Ct. 119, 122 (59 L.Ed. 295) the Supreme Court said: 'Where there are two statutes upon the same subject, the earlier being special and the later general, the presumption is, in the absence of an express repeal, or an absolute incompatibility, that the special is intended to remain in force as an exception to the general.' In Witte v. Shelton et al., 240 F. 265, 268, 153 C.C.A. 191, 194, this court said: 'Specific legislation upon a particular phase of a single subject is not affected by a subsequent law relating to a general subject which neither refers to the earlier law nor is repugnant to nor inconsistent with it, but the two laws must stand together, the former as the law of its specific phase of the subject, and the latter as the general law relating thereto.'"

The Court of Appeals for the Fourth Circuit stated the rule in Niagara Fire Insurance Co. of New York v. Raleigh Hardware Co., 62 F.2d 705, loc. cit. 709, in the following language:

"It is elementary that statutes are to be construed together when possible, and that repeals by implication are not favored. * * * The rule is well settled that 'where there are two statutes upon the same subject, the earlier being special and the later general, the presumption is, in the absence of an express repeal, or an absolute incompatibility, that the special is intended to remain in force as an exception to the general.' Washington v. Miller, 235 U.S. 422, 428, 35 S.Ct. 119, 59 L.Ed. 295; Rodgers v. U. S., 185 U.S. 83, 87–89, 22 S.Ct. 582, 584, 46 L.Ed. 816; Townsend v. Little, 109 U.S. 504, 512, 3 S.Ct. 357, 27 L.Ed. 1012.

"The rule stated in Sedgwick on the Construction of Statutory and Constitutional Law, p. 98, quoted with approval in Rodg-

148

ers v. U. S., supra, is as follows: 'The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms or treating the subject in a general manner, and not expressly contradicting the original act, shall not be considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter act such a construction, in order that its words shall have any meaning at all.' "

Again in the case of United States v. Hess, 8 Cir., 71 F.2d 78, loc. cit. 79, this court restated the rule as follows: "Where there are two statutes upon the same subject, one general and the other special, the special statute is recognized as an exception to the generality of the other statute without regard to priority of enactment." Citing a number of cases.

And in Baltimore & O. R. Co. v. Chicago River & Indiana R. Co., 7 Cir., 170 F.2d 654, loc. cit. 658, appears the following statement of the rule: "The primary rule of statutory construction is to give effect to the intention of the legislature. Whenever that is apparent it dominates and interprets the language used. So where there are two statutes, the earlier special and the later general, the special controls the general, and the fact that one is special and the other is general creates a presumption that the special is to be considered as remaining an exception to the general. The general will not be understood as repealing the special, unless a repeal is expressly named, or unless the provisions of the general are manifestly inconsistent with those of the special."

It is not only unnecessary to a logical construction of the filing Act of 1945 that the long-established system of establishing rates in Nebraska be overturned, but in my judgment it might be disastrous to the validity of most, if not all, utility rates in Nebraska during the period from 1945 until the passage of the recent amendment to construe the filing Act of 1945 as repealing or superseding that system. I do not believe the legislature intended to do so. I believe that if they had intended to do so they would have said so.

For the foregoing reasons, I respectfully dissent.